1  CARMEN R. SHAIN (SBN 269879)
2  HARRISON BARNES PLC
   23410 Civic Center Way, Suite E-10
3  Malibu, California 90265
   Telephone: (310) 598-1719
4  Facsimile: (310) 598-1735
5  cshain@harrisonbarnes.com

6  Attorney for Plaintiff
   A. HARRISON BARNES

COPY

FILED
CLERK, U.S. DISTRICT COURT

JUL 1 7 2014

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

7
8              UNITED STATES DISTRICT COURT
9              CENTRAL DISTRICT OF CALIFORNIA
               WESTERN DIVISION
10

11  A. HARRISON BARNES, individually     CASE NO.  Case No. 2:14-cv-4098-
    and on behalf of the A. Harrison     ODW (MRWx)
12  Barnes Trust – 2005;
                                         FIRST AMENDED COMPLAINT
13          Plaintiff,                   FOR:

14      vs.                              1. VIOLATION OF THE
                                            RACKETEER
15  CROWN JEWELS, LLC, a California          INFLUENCEDAND CORRUPT
    limited liability company; KONA          ORGANIZATIONS ACT – § 18
16  CROWN HOLDINGS, LLC, a               U.S.C. 1961, ET AL.;
    California limited liability company;
17  MALIBU INVESTMENT GROUP,            2. FRAUD;
    LP, a California limited partnership;
18  32430 PCH, LLC, a California limited  3. NEGLIGENT
    liability company; REPUBLIC             MISREPRESENTATION;
19  WESTERN INVESTMENTS CO,
    LLC, a California limited liability    4. DECLARATORY RELIEF;
20  company; MAYER SEPARZADEH,
    an individual; DAVID YORK, an         5. ANTICIPATORY BREACH OF
21  individual ANNETTE                       CONTRACT;
    SEPARZADEH, an individual; and
22  DOES 1 through 50, inclusive,        6. CONVERSION;

23          Defendants.                  7. BREACH OF IMPLIED
                                            COVENANT OF GOOD FAITH
24                                          AND FAIR DEALING; AND,

25                                       8. VIOLATION OF BUSINESS
                                            AND PROFESSIONS CODE
26                                          §17200.

27                                       DEMAND FOR JURY TRIAL
28

-1-
FIRST AMENDED COMPLAINT; DEMAND FOR JURY TRIAL

## TABLE OF CONTENTS

I.     OVERVIEW ........................................................................4

II.    INTRODUCTION.................................................................4

III.   JURISDICTION AND VENUE ...........................................5

IV.   PARTIES .............................................................................6

V.     STATUTORY AND LEGAL FRAMEWORK.....................8

VI.   FACTS ...............................................................................11

    A.    DEFENDANTS' HISTORY WITH THE HOME
          AS PREDATORY LENDERS........................................11

    B.    BARNES' INTEREST IN PURCHASING THE
          HOME. ......................................................................14

    C.    BARNES AGREES TO PURCHASE THE HOME
          BASED ON DEFENDANTS' PROMISE OF THE
          AVAILABILITY OF FUTURE FINANCING IN
          EXCHANGE FOR HIS LIFE SAVINGS.....................16

    D.    DEFENDANTS DELAY RECORDING THE
          OPTION WHILE ILLEGALLY SECURING A
          MORTGAGE ON THE HOME AND
          DEMANDING BARNES AND HIS WIFE LIE TO
          A BANK........................................................................18

    E.    IN THE MIDST OF THE FINANCIAL CRISIS,
          DEFENDANTS FRAUDLENTLY INDUCE
          BARNES TO INCREASE HIS ANNUAL
          "OPTION PAYMENTS" FROM $1,000,000 TO
          $1,600,000 .................................................................20

    F.    DEFENDANTS DO NOT EXECUTE THE
          AMENDED AGREEMENT FOR SEVENTEEN
          MONTHS AND NEVER RECORD THE
          AMENDED OPTION MEMORANDUM. ....................22

    G.    DEFENDANTS REFUSE TO ALLOW BARNES
          TO ASSUME THE MORTGAGE AS
          PROMISED....................................................................23

FIRST AMENDED COMPLAINT; DEMAND FOR JURY TRIAL

H.   DEFENDANTS REFUSE TO WORK WITH
     BARNES AFTER BARNES OBTAINS BANK
     FINANCING ........................................................................... 25

I.   FROM JUNE THROUGH JULY OF 2011,
     DEFENDANTS REVEAL THAT THEY ARE IN
     DIRE FINANCIAL STRAITS, THE MORTGAGE
     IS NOT ASSUMABLE AND THAT THEY WILL
     LOSE THE HOME UNLESS BARNES COMES
     UP WITH MILLIONS MORE............................................... 30

J.   YORK THROWS A PARTY FOR HUNDREDS
     OF PEOPLE AT THE HOME, ASKS BARNES
     TO GO STAY AT A HOTEL AND LEAVES A
     HUGE MESS FOR BARNES TO CLEAN UP. ...................... 32

VII.   FIRST CAUSE OF ACTION .................................................. 34

A.   RICO ENTERPRISE.............................................................. 34

B.   UNLAWFUL CONDUCT AND PATTERN OF
     RACKETEERING ACTIVITY ............................................. 34

C.   CONTINUITY AND RELATEDNESS OF THE
     PATTERN OF RACKETEERING ......................................... 37

D.   RICO INJURY ...................................................................... 38

VIII.   SECOND CAUSE OF ACTION ............................................. 39

IX.   THIRD CAUSE OF ACTION................................................. 41

X.   FOURTH CAUSE OF ACTION.............................................. 42

XI.   FIFTH CAUSE OF ACTION.................................................. 43

XII.   SIXTH CAUSE OF ACTION ................................................. 44

XIII.   SEVENTH CAUSE OF ACTION .......................................... 45

XIV.   EIGHTH CAUSE OF ACTION ............................................. 46

XV.   PRAYER FOR RELIEF ......................................................... 47

FIRST AMENDED COMPLAINT; DEMAND FOR JURY TRIAL

## I.   OVERVIEW

1.     A home buyer is financially and emotionally vulnerable when investing in a residence.  A residential property is shelter and security for a family.  Thus, law and public policy provide numerous protections for residential real estate purchases.

2.     Predatory lenders attempt to avoid these protections and place homeowners in harm's way.  For example, they often employ sophisticated, high-priced attorneys who use "lease options" and other tools to lure homeowners in and steal their life savings.  Some lenders may also operate through a complex network of "shell companies" to avoid liability.

3.     The "lease option" is a "rent-to-own" scheme.  A legally constructed lease option enables residential buyers to (a) make a small payment in exchange for the right to buy a family home at a predetermined time in the future and (b) live in the home while making market-rate lease payments.

4.     Lease options can also be written illegally – in which case they are not lease options at all.  There are, of course, various federal and state laws to protect homeowners against illegal contracts and this is what this case entails: A family who was tricked, defrauded and stripped of both their life savings and home by sophisticated operators who used fraud to induce this family into an illegal contract and took over $8,300,000 from the family in four short years.

5.     Incredibly, Defendants did something similar to another family – with the very same home – a few years earlier.

## II.   INTRODUCTION

6.     In September of 2007, the A. Harrison Barnes Trust ("Barnes" or "Plaintiff") entered into a real estate option agreement for a home and adjoining lot located at 32430 Pacific Coast Highway and 32434 Pacific Coast Highway (collectively "the Home") with Defendants.  Defendants told Barnes that in exchange for $1,200,000 paid immediately, $50,000 a month in above-market rent

-4-

1   (plus property taxes, insurance, maintenance and other expenses), a $50,000
2   security deposit and $1,000,000 in annual "option payments" over four years, his
3   family could take possession of the $14,750,000 home (the "Agreement").  In
4   addition to paying above-market rent and $5,450,000 in "option" payments,
5   Barnes made over $450,000 in improvements to the Home during the four short
6   years he was there.

7        7.     Defendants then defrauded Barnes, as well as banks, through false
8   representations, opinions and promises, and concealment of Barnes' interest in the
9   Home by repeatedly thwarting title recording efforts of the Agreement.
10  Defendants' conduct put Barnes in a position where he was unable to complete his
11  installment purchase and was subsequently forced to resort to self-help and
12  abandon the Home in order to avoid further catastrophic financial losses.  As a
13  result of Defendants' fraudulent conduct, Barnes was left with nothing after
14  pouring $8,343,022.09 into the Home in four short years.

15       8.     Furthermore, the Agreement Barnes signed was not an "option",
16  regardless of its characterization in title and form.  Under California law, the
17  Agreement was a purchase agreement and the "option payments" Barnes made
18  were illegally kept by Defendants as liquidated damages, penalties and/or
19  forfeitures in violation of Cal. Civ. Code §§ 1670, 1671, 1675, 1677, 3369 and/or
20  3294.  Defendants' illegal scheme injured Barnes because they kept $5,450,000 in
21  option payments in violation of California's liquidated damages law as applied to
22  residential purchase contracts.

23                    **III.   JURISDICTION AND VENUE**
24       9.     This action arises under federal law including the Racketeer
25  Influenced and Corrupt Organizations provisions of the Organized Crime Control
26  Act of 1970 ("RICO"), 18 U.S.C. § 1961, *et al.*, federal common law and
27  California laws.

28       10.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

1    11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c)

2    because Defendants reside and do business in this judicial district and because the

3    property that is the subject of this action is situated here.

4    12.    Venue is proper because, in the absence of an express agreement by

5    the parties to the contrary, the question of whether the parties agreed to arbitrate a

6    dispute is one for the courts to resolve. *See First Options of Chi., Inc. v. Kaplan*,

7    514 U.S. 938, 943-945 (1995).

8    ### IV.  PARTIES

9    13.    Barnes is and was the Trustee of the A. Harrison Barnes Trust – 2005

10   and an individual residing in Los Angeles County, California.

11   14.    Plaintiff is further informed and believes that Defendant David York,

12   an individual who changed his name from "David Yadegaran" to "David D.

13   York" ("York"), is and was an officer of Crown Jewels, LLC ("Crown Jewels"),

14   Kona Crown Holdings, LLC ("Kona Crown") and 32430 PCH, LLC and an

15   individual residing in Los Angeles County, California.  Plaintiff is further

16   informed and believes that York is and was an officer of Republic Western

17   Investments Co., LLC ("Republic Western") through the "shell" entity York

18   Enterprises, Inc. ("York Enterprises").  Plaintiff is further informed and believes

19   that York currently owns the Home through Crown Jewels and Republic Western.

20   Plaintiff is further informed and believes that York is and was affiliated with

21   Malibu Investment Group, LP ("Malibu Investment"), Action Investment Group,

22   Inc. ("Action Investment"), Ine Capital Holdings, LLC ("Ine Capital") and York

23   Enterprises.

24   15.    Plaintiff is further informed and believes that Defendant Mayer

25   Separzadeh ("Mr. Separzadeh") is and was an officer of Malibu Investment and

26   Action Investment and an individual residing in Los Angeles County, California.

27   Plaintiff is further informed and believes that Mr. Separzadeh is affiliated with

28   Crown Jewels, Kona Holdings, 32430 PCH, LLC, and Republic Western..  Mr.

-6-

Separzadeh has owned several commercial and residential properties in this district, including the nightclub "Icon Ultra Lounge" which closed in November 2013 after the Los Angeles City Zoning Administrator began investigating whether the business qualified as a public nuisance due to two hundred eighty-six (286) Los Angeles Police Department service calls and a number of assaults, stabbings, and one known homicide. (*See* Exhibit A.)

16.     Plaintiff is further informed and believes that Defendant Annette Separzadeh ("Mrs. Separzadeh") is and was an individual residing in Los Angeles County, California.

17.     Plaintiff is further informed and believes Defendant Crown Jewels, is and was a California limited liability company, conducting real property ownership and management business in Los Angeles County, California.

18.     Plaintiff is further informed and believes Defendant Kona Crown Holdings is and was a California limited liability company, conducting real property ownership business in Los Angeles County, California.

19.     Plaintiff is further informed and believes Defendant 32430 PCH, LLC is and was a California limited liability company, conducting real property ownership business in Los Angeles County, California.

20.     Plaintiff is further informed and believes Malibu Investment is and was a California limited partnership, conducting business in Los Angeles County, California.

21.     Plaintiff is further informed and believes Defendant Republic Western is and was a California limited liability company, conducting business in Los Angeles County, California.  Plaintiff is further informed and believes Defendant Republic Western was originally set up in 2010 to be managed by one manager, Behzad Nehmadi, for the business of "ownership of real estate".  On December 12, 2013, Defendant Republic Western filed a statement of

1 information, which added York Enterprises as a "co-manager" of Republic

2 Western.

3     22.    The true names and capacities, whether individual, corporate,

4 associate or otherwise, of the defendants named as Does 1 -10, inclusive, are

5 unknown to Plaintiff who sues said Defendants by such fictitious names.  Plaintiff

6 will seek leave to amend this Complaint to show the true names and capacities of

7 the fictitiously-named Defendants when ascertained.  Plaintiff is informed and

8 believes that each of the Defendants named as a Doe herein is legally responsible

9 in some manner for the acts, omissions and events referred to herein and

10 proximately caused the injuries and damages alleged.

11     23.    Plaintiff is informed and believes that at all times herein mentioned

12 each of the Defendants was and/or currently is an officer, agent, servant,

13 employee or representative of at least one of the other Defendants and, in doing

14 the things alleged herein, was acting within the scope of its, his or her authority as

15 such agent, servant, employee or representative.

16     24.    There is unity of interest between Defendants, and each acts as the

17 alter ego of the other.

18 **V.  STATUTORY AND LEGAL FRAMEWORK**

19     25.    Illegal contracts are void under California and federal law. *See*

20 *Kaiser Steel Corp. v. Mullins,* 455 U.S. 72, 77-78 (1982); *see also Goldstein v.*

21 *Lees,* 120 Cal. Rptr. 253, 259 (Ct. App. 1975).

22     26.    With respect to real estate option contracts, both California and

23 federal courts analyze the terms and the surrounding circumstances to determine

24 whether an instrument is a true "option." *See Scarbery v. Bill Patch Land &*

25 *Water Co.*, 7 Cal. Rptr. 408, 415 (Ct. App. 1960); *see also Inamed Corp. v.*

26 *Medmarc Cas. Ins. Co.*, 258 F. Supp.2d 1117, 1121 (C.D. Cal. 2002).

27

28

27.     The title or form of an instrument does not determine whether an instrument is an "option" because "[t]he law looks through form to substance and gives effect to the intention of the parties." *Scarbery*, 7 Cal. Rptr. at 416.

28.     ***Where option payments are very high in relation to the purchase price, California courts characterize the transaction as a purchase agreement and the option payments as deposits*** if it would cause an unreasonable forfeiture or penalty if the transaction is not consummated. *See Id.* at 418.

29.     For federal tax purposes, where option payments substantially exceed the actual rental value of the property, the lease option will usually be treated as an installment sale. *See Haggard v. Comm'r of Internal Revenue, 241 F.2d 288*, (9th Cir. 1956). Additionally, a sale is indicated where a tenant makes substantial improvements to the property and the tenant's investment can only be recouped by exercising the option. *Oesterreich v. Comm'r of Internal Revenue*, 226 F.2d 798. Furthermore, an option payment that is high in relation to the ultimate purchase price will cause the transaction to be re-characterized as an installment sale, with periodic option payments treated as interest on an installment note. *See Elrod v. Commissioner,* 87 T.C. 1046 (1986); *see also* Gerald J. Robinson, Federal Income Taxation of Real Estate, ¶ 4.07 Payments Under Leases With Options (Thomson Reuters Tax and Accounting 2014).

30.     If an "option" transaction is classified as a purchase or sale agreement, option payments are considered "deposits" and constitute an invalid penalty or forfeiture (*see* Cal. Civ. Code §§ 3294, 3369 and *Kuish v. Smith*, 105 Cal. Rptr. 3d 475, 482-83 (Ct. App. 2010)) and violate California liquidated damages law if the seller keeps them. *See* Cal. Civ. Code §§ 1670, 1671, 1675; *Kuish,* 105 Cal. Rptr. 3d at 483. In addition, Cal. Civil Code § 1678 prohibits a seller from keeping liquidated damages as "option" payments unless "a separate liquidated damages provision satisfying the requirements of Section 1677 is

1  separately signed or initialed by each party to the contract for each such

2  subsequent payment." *Allen v. Smith*, 114 Cal. Rptr. 2d 898, 907 (Ct. App. 2002).

3      31.    Moreover, Cal. Civil Code §1677 requires "(a) The provision is

4  separately signed or initialed by each party to the contract; and (b) If the provision

5  is included in a printed contract, it is set out either in at least 10-point bold type or

6  in contrasting red print in at least eight-point bold type."

7      32.    Furthermore, pursuant to 18 U.S.C. § 1962 it is unlawful to:

8          (a)    invest income derived from a pattern of racketeering activity in

9                   an "enterprise" as defined by 18 U.S.C. § 1961(4) as "any

10                   individual, partnership, corporation, association, or other legal

11                   entity, and any union or group of individuals associated in fact

12                   although not a legal entity";

13          (b)    acquire or maintain an interest in an enterprise through a pattern

14                   of racketeering activity;

15          (c)    conduct the affairs of an enterprise through a pattern of

16                   racketeering activity; or

17          (d)    conspire to commit any of the above acts.

18      33.    18 U.S.C. § 1961(1)(B) [1] defines "racketeering activity" as "any act

19  which is indictable under any of the following provisions of title 18, United States

20

---

21  [1]    Because this transaction would be re-characterized as an installment sale,
Defendants were obligated to record Barnes' interest and not to encumber the

22  Home.  Here, Plaintiff is informed and believes Defendants also violated Cal. Civ.
Code § 2985.2 by (1) delaying recording on multiple instances and (2) taking out a

23  $8,500,000 mortgage on the Home after selling it to Barnes.

24      Furthermore, Plaintiff is informed and believes Defendants *misappropriated*

25  *every single payment that Barnes made* on the Home and knowingly violated the
criminal provisions of Cal. Civ. Code § 2985.3 *at least fifty separate times*.  After

26  Barnes had given Defendants close to $8,000,000, Defendants told Barnes they had
spent all the money Barnes had given them and were in danger of losing the Home

27  to foreclosure.

                                (Footnote continues on following page.)

28

1    Code ... section 1343 (relating to wire fraud)...[and] section 1344 (relating to

2    financial institution fraud)."

3        34.    18 U.S.C. § 1964(c) states "[a]ny person injured in his business or

4    property by reason of a violation of section 1962 of this chapter may . . . recover

5    threefold the damages he sustains and the cost of the suit, including a reasonable

6    attorney's fee."

7                              **VI. FACTS**

8

9    **A.    DEFENDANTS' HISTORY WITH THE HOME AS**
           **PREDATORY LENDERS.**

10

11       35.    In 2003, Peter Frommer ("Frommer") bought the Home. (*See*

     Exhibits B and C.)

12

13       36.    Plaintiff is informed and believes that from early 2004 through

     August 2006, Frommer solicited more than $13,000,000 from more than five

14

15   dozen victims by promising "guaranteed" returns of up to 15% in as little as six

     weeks and secured some of these "investments" against the Home.  Frommer used

16

17   the victims' money to make Ponzi payments and to maintain a lavish personal

     lifestyle, which included parties at the Home that featured celebrity performers,

18

19   private jet trips to Europe, a large household staff and exotic automobiles.

     Frommer was sentenced in April 2011 to nine years in federal prison for wire

20

21   fraud, money laundering and three counts of failing to file federal income tax

     returns. (*See* Exhibit D.)

22

23   _____

24   (Footnote continued from previous page)

25       Finally, because Defendants delayed recording Barnes' interest in the Home
     while they mortgaged it for $8,500,000, Plaintiff is informed and believes
26   Defendants also violated 18 U.S.C. § 1001 (felony criminal concealment and
     misrepresentation).
27

28

                                    -11-

37.     Plaintiff is informed and believes Defendants York and Mr. Separzadeh are "hard money lenders" and extremely sophisticated real estate investors earning millions in profits.

38.     Plaintiff is informed and believes Defendants York and Mr. Separzadeh have created an intricate web of corporations, limited liability partnerships, limited partnerships and limited liability companies in order to conduct real estate transactions through these entities to avoid liability.  This complex web includes Defendants Crown Jewels, Kona Crown Holdings, Republic Western Malibu Investment 32430 PCH, LLC, York Enterprises, Inc., Ine Capital and Action Investment.  Plaintiff also is informed and believes that to protect against illegal activity which has already occurred with respect to Plaintiff, Defendants have begun and will continue shuffling properties in and out of these and other "shell" entities to make recovery from their fraudulent activities extremely difficult – if not impossible.  For example, Plaintiff is informed and believes the Home was recently "sold" to York's shell company, Defendant Republic Western for only $840,000—despite the property being worth over $10,000,000.

39.     Plaintiff is informed and believes Defendants, together with others, own real estate all over the country, including Hawaii.

40.     For example, Plaintiff is informed and believes Defendants, together with others including Defendants' attorney, Robert Weiss ("Weiss"), work together to make illegal profits through real estate transactions and the borrowing and lending of money to individuals, associations and corporations through "shady" transactions.

41.     Plaintiff is informed and believes Defendants became aware of Frommer's illegal Ponzi scheme and realized he had substantial equity in the Home that they could get by making him a loan under conditions where compliance would be nearly impossible.  Instead of reporting their suspicions

1    immediately to authorities, Plaintiff is informed and believes Defendants loaned

2    Frommer at least $2,500,000 beginning January of 2005 to fund the purchase of a

3    lot at 32320 Pacific Coast Highway ("32320 PCH"), and made Frommer secure

4    this loan against the Home. (*See* Exhibits E-I.)

5         42.    In a conversation years later, Defendant York told Barnes that he and

6    Mr. Separzadeh knew Frommer was "bad news" when they made the loan and

7    engineered the Frommer recording so Defendants' loan would take precedence

8    over other loans, including the Ponzi-scheme victims. In all instances where

9    Defendants' interest was involved, Defendants' promptly recorded their loans.

10    (*See* Exhibit E – agreement executed January 10, 2005 and recorded January 12,

11    2005; Exhibit F - agreement executed January 10, 2005 and recorded January 12,

12    2005; Exhibit G – agreement executed February 28, 2005 and recorded March 1,

13    2005; Exhibit H – agreement executed April 3, 2005 and recorded April 12, 2005;

14    and Exhibit I – agreement executed April 14, 2005 and record April 20, 2005.) In

15    contrast, the recording of Barnes' interest in the Home was delayed for months –or

16    never recorded at all. (*See* ¶ 74-76 and 89-90 herein.)

17         43.    Plaintiff is informed and believes Defendants knew Frommer could

18    not reasonably comply with the terms of their "hard money" predatory loan

19    agreement and structured it in such a way that Defendants were extremely likely to

20    foreclose on the Home and profit at the expense of Frommer, banks and

21    Frommer's victims.

22         44.    Plaintiff is informed and believes Defendants foreclosed on the Home

23    and 32320 PCH based on their predatory agreement with Frommer. (*See* Exhibits

24    J, K and L.)

25         45.    Plaintiff is informed and believes that on September 28, 2006,

26    Defendants purchased the Home at an "orchestrated" public auction. Defendants

27    purchased the Home for $200,000 and 32320 PCH for $551,000. (*See* Exhibits J,

28    K and L.) At the time of this "orchestrated sale," the properties were worth close

to $20,000,000.  (*See* Exhibit D.)  York later bragged to Barnes that he "could not believe I talked the bank into walking away from the property so cheap" and "I couldn't believe we got the bank to walk away from millions of dollars."  Plaintiff is informed and believes that Defendants have consistently made misleading statements to fraudulently take properties away from banks and other individuals in violation of 18 U.S.C. § 1001.

46.     When Defendants foreclosed on the Home, Frommer filed for bankruptcy and Frommer's Ponzi-scheme collapsed after coming to the attention of Ponzi-scheme victims, the Federal Bureau of Investigation and other authorities. (*See* Exhibit D.)

47.     Plaintiff is informed and believes that Defendants continued to shift their ownership interests in the Home between their intricate web of affiliated entities.  (*See* Exhibits M and N.)

48.     Plaintiff is informed and believes that Defendants placed the Home on the market for $14,750,000 and sought to make a $14,000,000 profit.

49.     Plaintiff is informed and believes that Defendants sold 32320 PCH, the lot they had loaned Frommer $2,500.000 on, for $8,750,000 and made huge profits.

50.     Plaintiff is informed and believes Doug Carroll ("Carroll"), from Prudential Real Estate, and Wendy Carroll, from Sotheby's International Realty, (collectively "the Carrolls") represented Defendants in their real estate transactions with both the lot and Home.  The Carrolls are brother and sister.

## B.     BARNES' INTEREST IN PURCHASING THE HOME.

51.     In July of 2007, Carroll was showing the Home at a Sunday open house.  Barnes, his wife and baby were driving down Pacific Coast Highway and stopped in.

52.     After Carroll showed them the Home, Barnes' wife told Carroll it was her dream home.

53.   Carroll informed the couple that the Home was priced at $14,750,000. Barnes responded that was far beyond their budget; but, after some discussion, Carroll explained there "might be a way to work something out."

54.   Over the next several days, Barnes and Carroll spoke.  Carroll explained that the sellers were "interested in working with" Barnes, but any transaction would require $1,000,000 down.

55.   Barnes' life savings was invested in his Pasadena, California home. Barnes had worked since he was sixteen years old and his life savings were in the property.

56.   Barnes contacted Carol Chua ("Chua"), the real estate agent that had sold him his Pasadena home, and asked her to "let him know" if she learned of a good buyer for the Pasadena home.  Within a few days, Chua found a buyer.  The buyer was in a hurry to close the sale because her daughter was starting school in Pasadena that fall.

57.   Barnes informed Carroll he could clear approximately $1,200,000 if he sold his Pasadena home.  Carroll told Barnes Defendants now required $1,200,000 down and would allow Barnes to move into the Home and pay $50,000 a month in above-market rent for four years; an additional $50,000 security deposit; all utilities, maintenance, real property taxes and insurance and three (3) $1,000,000 annual installment payments.  Barnes would also have to complete a home renovation in progress.  In exchange, Barnes could either continue "working with" the sellers at the end of the four-year "option" period, or finance the balance of the purchase price with a bank of his choosing.

58.   After Barnes had agreed to sell his Pasadena home, he became nervous about the Home transaction because Defendants were not providing a proposed agreement.  Barnes informed Carroll he wanted to speak with Defendants and that he was strongly considering walking away from the deal.

59.     York called Barnes from Hawaii a short time thereafter.  York told Barnes that because $1,200,000 was not enough for Barnes to qualify for a traditional mortgage, he and his partners wanted to structure the sale to Barnes initially as an "option" because it would show them Barnes was "committed" to the property so they could give him more traditional financing in the future, or Barnes could get financing on his own.  York explained that Defendants were "like a bank" and lent people money for their homes all the time and wanted to work with Barnes.  When Barnes asked York how many option payments he would need to make before Defendants saw he was committed, York responded "a few option payments."

60.     York briefly mentioned that this sort of transaction made a lot of sense for Defendants from a tax perspective.  (A few years later, York told Barnes Defendants had illegally used the option money they received tax free.)

61.     York further explained that the Agreement was taking him a lot of time because Defendants were acting as Barnes' "bank" in this transaction and needed to put the same care and attention into the documents as a bank doing a mortgage would.

62.     Plaintiff is informed and believes that Defendants induced Barnes to enter into the agreement with the promise of future financing they never intended to provide and with little or no regard as to Barnes' ability to exercise the option.  Plaintiff is also informed and believes that Defendants never intended to give Barnes a mortgage after he paid them "a few" option payments.

## C.     BARNES AGREES TO PURCHASE THE HOME BASED ON DEFENDANTS' PROMISE OF THE AVAILABILITY OF FUTURE FINANCING IN EXCHANGE FOR HIS LIFE SAVINGS.

63.     Relying on York's promises, Barnes sold his Pasadena home.  Barnes moved into a hotel with his wife and baby and parked his family's possessions in a

1    moving truck on Pacific Coast Highway while waiting for the Agreement from

2    Defendants.

3        64.    Due to various delays by Defendants and Weiss, Barnes' attorney did

4    not receive the relevant documents until he was out to dinner on a Saturday night

5    over the 2007 Labor Day weekend.  Barnes had been living in a hotel for over a

6    week at this time and was in a hurry to close.  On September 5, 2007, the parties

7    executed a contract titled "Option Agreement" (the "Agreement").  (*See* Exhibit

8    O.)  In the Agreement, Barnes was referred to as "the Buyer," not "the Optionee."

9        65.    The Agreement incorporated by reference a Residential Lease

10   Agreement, a Home Purchase Agreement, and a Lot Purchase Agreement.  (*See*

11   Exhibit O.)  Barnes agreed to pay $4,200,000 in annual installment payments

12   which would be credited to the "Purchase Price" of the Home.  (*See* Exhibit O,

13   Sections 3 and 6 of the Agreement.)  The "Purchase Price" of the Home was set at

14   $14,750,000.  (*See* Exhibit O, Section 2.16 of the Home Purchase and Sale

15   Agreement and Section 2.10 of the Lot Purchase and Sale Agreement.)

16       66.    Barnes also agreed to pay Defendants $50,000 in monthly (above-

17   market-rate) lease payments. (*See* Exhibit O, Residential Lease Agreement section

18   3.)

19       67.    Plaintiff is informed and believes residential lessors are not normally

20   responsible for real property taxes and insurance in leases.  Here, Barnes was

21   responsible for all utilities and services, real property taxes and Home insurance.

22   (*See* Exhibit O, Residential Lease Agreement sections 4, 10 and 11.)

23       68.    Plaintiff is informed and believes residential lessors are not normally

24   responsible for maintenance, alterations, repairs and Americans with Disabilities

25   Act ("ADA") compliance.  Here, the Agreement released Defendants from any

26   obligation of any nature to repair and maintain the Home, and shifted the

27   responsibility for all maintenance, alterations and repairs to Barnes (at Barnes' sole

28   cost and expense).  Barnes was also required to make any modifications or

1    additions at his expense if the Home was found to be non-ADA compliant. (*See*

2    Exhibit O, Residential Lease Agreement Section 22.)

3        69.    Plaintiff is informed and believes real estate agents normally receive a

4    5% to 6% commission on *lease payments*. However, Plaintiff is informed and

5    believes that despite their protests, the Carrolls received a commission only on the

6    *option payments*. Plaintiff is informed and believes that Doug Carroll was told by

7    York he was not entitled to a commission on the lease payments *because the*

8    *transaction was more like a sale than a lease*.

9    **D.    DEFENDANTS DELAY RECORDING THE OPTION**

10   **WHILE ILLEGALLY SECURING A MORTGAGE ON**

11   **THE HOME AND DEMANDING BARNES AND HIS**
     **WIFE LIE TO A BANK.**

12       70.    Shortly after Barnes moved into the Home, York contacted Barnes

13   and told him  Defendants were going to mortgage the Home.  York stated that

14   various people from the bank would be coming by and ordered Barnes not to say

15   anything about the Agreement.  York told Barnes that the Agreement was

16   confidential and Barnes was under an obligation not to say anything to anyone

17   about it.  York told Barnes to "just tell the Bank you are a 'temporary renter' if

18   they ask you anything."  York also informed Barnes that Defendants were

19   mortgaging the home to "do you a favor" and put together "the sort of loan that

20   you can one day assume with the bank."  York explained that Defendants were

21   "hard money lenders" and Barnes would get better terms from the mortgage than

22   Defendants had planned to give him.  York told Barnes that the terms of the new

23   mortgage would be better than the terms that Barnes could get on his own because

24   Defendants were much wealthier and "credit worthy" than Barnes.  At one point

25   during York's discussions with Barnes, he told Barnes that he was "a

26   $100,000,000 man" and personally worth over $100,000,000 but "modest" and

27   "not interested in jets or anything like that."

28

-18-

71.     Because Barnes thought it was in his best interest to remain silent, Barnes instructed his wife go along with York's ruse.  Barnes and his wife did not realize that York was violating any state or federal laws at that time.

72.     York brought the bank to the Home in October 2007.  After the bank had left, York spent approximately an hour with Barnes and his wife.  York told them he was happy to be helping them with their dream home and encouraged them to make renovations and do whatever they needed to make the property their home.

73.     York discussed how he had grown up in Iran where conditions were hard and it made him happy seeing people enjoying such a nice home.  York also told the couple that "David York" was not his birth name and he had changed it when he immigrated to the United States.  York said having a new name had helped him in business because Americans trusted people with more "English sounding" names.

74.     York told Barnes that the new mortgage would make it "seamless" for him to exit the Home after Barnes had accumulated more equity.  York discussed his great wealth and told Barnes and his wife that he "really liked them a lot" and would "look out for them".  In fact, Barnes' wife and York's children had attended the same school.  After these discussions, the couple really believed York was looking out for them.

75.     Unbeknownst to Barnes and his wife, during this time Defendants had been stalling recording the Agreement that Barnes had signed prior to moving in. Even though Barnes' attorney submitted a "Memorandum of Option Agreement" ("Option Memorandum") and instructed a title company to record the document on September 21, 2007 (*See* Exhibit P), the Option Memorandum was not recorded until more than two months after Barnes moved in (*See* Exhibit Q). Plaintiff is informed and believes that Defendants had been withholding

1   information from the title company that was necessary to get the Option

2   Memorandum recorded.  (*See* Exhibit R.)

3        76.    Bank of America recorded a mortgage on the Home in December of

4   2007 (*See* Exhibit S).  Plaintiff is informed and believes that the bank was likely

5   not aware of Barnes' agreement with Defendants when it gave them a mortgage.

6   In fact, Plaintiff is informed and believes that the bank would not have given

7   Defendants a mortgage on the Home if they knew that Barnes had such a

8   substantial interest in it.  Barnes also is informed and believes that Defendants

9   intentionally delayed recording the Option Memorandum to defraud the bank.

**E.    IN THE MIDST OF THE FINANCIAL CRISIS, DEFENDANTS FRAUDULENTLY INDUCE BARNES TO INCREASE HIS ANNUAL "OPTION PAYMENTS" FROM $1,000,000 TO $1,600,000.**

14       77.    After entering into the Agreement, Barnes and York conversed and

15  met frequently regarding Barnes' desire to assume the mortgage.  Barnes travelled

16  often for business and called and spoke to York from numerous states.  York also

17  travelled frequently for business and called and spoke to Barnes from numerous

18  states.

19       78.    Due to the financial crisis and Barnes' own deteriorating finances,

20  Barnes was concerned about his ability to qualify for a traditional mortgage with a

21  bank and was eager to assume the loan.  Barnes also wanted to lower his

22  payments on the Home to make them more manageable.

23       79.    Contrary to York's representations and promises prior to and after

24  executing the Agreement, York now began to state on several occasions "the

25  quicker you can get to one-third of the purchase price, the better off we all will

26  be."  Thus, even though the "option" payments were not due pursuant to the

27  Agreement until September 5th of each year, Barnes frequently made his "option"

28  payments months ahead of the dates they were due.  (*See* Exhibits O and T.)

-20-

80.     York repeatedly told Barnes that he needed to "accumulate more equity" before Defendants would allow him to assume the mortgage.  York frequently asked questions like *"how much can you afford?"* and stated that the more money Barnes gave Defendants, the more comfortable Defendants would be in allowing him to assume the mortgage.

81.     By March of 2009, Barnes had paid $3,041,674.24 in "option" payments and made all other payments according to the Agreement.  (*See* Exhibit T.)  York told Barnes the only way he could assume the mortgage was to increase his "option" payments and urged Barnes to do so quickly.  *Barnes agreed to pay an additional $50,000 a month*.

82.     At this time, property values and financial markets were deteriorating.  Barnes had a young daughter and his wife was pregnant with their second child.  Barnes had spent his life savings on the first $1,200,000 "option" payment in September 2007, and each subsequent "option" payment was difficult to make because his business was in trouble.  Because Barnes was uncertain about the economy and was left with few alternatives to safeguard his investment, he agreed to increase his monthly payments to Defendants to $100,000 a month (with $50,000 a month going towards the purchase price as an "option") in addition to making the $1,000,000 annual "option" payments.

83.     Thus, on April 11, 2009, Barnes signed an agreement entitled "First Amendment of Option Agreement" (the "Amended Agreement").  Barnes agreed in the Amended Agreement to pay $7,150,000 in annual and monthly installment payments which would be credited to the "Purchase Price" of the Home.[2]  (*See*

---

[2]     Defendants required Barnes to execute the Amended Agreement with so-called "Arbitration Provisions," even though the "Arbitration Provisions" were not included in the Agreement executed in 2007.  (See Exhibit U, pages 500-503.)  However, the "Arbitration Provisions" failed to comply with Cal. Civ. Code §§ 1298(a) and (c), thus no valid arbitration clause existed.  Furthermore, the entire Amended Agreement is void *ab initio* because of fraud, thus the parties have not

(Footnote continues on following page.)

1    Exhibit U, Section 1 of the Amended Agreement and Exhibit O, Section 6 of the

2    Agreement.)

3         84.    Starting in May of 2009, Barnes paid (a) total annual option payments

4    of $1,600,000 and (b) almost $800,000 a year in rent and other expenses for the

5    Home, for (c) *a total outlay of over $2,400,000 a year towards the Home*.  (*See*

6    Exhibit T.)  Barnes made many of these payments via checks and wire transfers

7    from an office his company had in Ephraim, Utah.  Plaintiff is informed and

8    believes the wire transfers were processed through Citibank in New York.

9         85.    In addition, the Agreement required Plaintiff to make all payments

10   towards the Purchase Price within four years to complete the transaction.

11   However, the Amended Agreement extended this time period to five years, thus

12   requiring the Option Memorandum that was recorded on the Home's title to be

13   amended.  (*See* Exhibits P, Q and U.)

14        86.    Plaintiff is informed and believes that Defendants wanted to increase

15   the "option" term to five years because they were illegally failing to declare the

16   option payments to federal and state tax authorities and wanted to delay their tax

17   liability that would be triggered in the event of a sale (or Barnes leaving the

18   Home) under their interpretation of tax law.

19   **F.    DEFENDANTS DO NOT EXECUTE THE AMENDED**
     **AGREEMENT FOR SEVENTEEN MONTHS AND**
20   **NEVER RECORD THE AMENDED OPTION**
21   **MEMORANDUM.**

22        87.    Despite signing the Amended Agreement on April 11, 2009, and

23   making monthly $100,000 payments pursuant to that Amended Agreement, on or

24   _____

25   (Footnote continued from previous page)

26   agreed to arbitrate any controversy arising from the Agreement or the Amended
     Agreement.  (*See Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal. 4th 394, 416 (Cal.
27   1996)).

28

around August 3, 2010, Barnes discovered that the Option Memorandum recorded on November 9, 2007 had not been amended to reflect the Amended Agreement.

88.     To Barnes' shock, Defendants had not yet even executed the Amended Agreement. (*See* Exhibit U notarized signature of Mrs. Separzadeh.)

89.     The Amended Agreement was finally executed on August 30, 2010, after Barnes' attorney harassed Weiss for weeks to obtain a fully executed Agreement required for the recording. (*See* Exhibit U notarized signature of Mrs. Separzadeh.)

90.     Plaintiff is informed and believes ***Defendants failed to execute the Amended Agreement for almost seventeen (17) months*** to prevent the recording of the Amended Option Memorandum which would have made it more difficult for them to illegally use the Home as security for other loans and commitments.

91.     When the Amended Agreement was finally executed seventeen months later, Defendants never recorded it despite Barnes' attorneys' best efforts.

92.     Plaintiff is informed and believes that Defendants may have used the Home as security for additional loans while Barnes was paying option payments and did not want to show Barnes' interest in the Home on the title.

## G.     DEFENDANTS REFUSE TO ALLOW BARNES TO ASSUME THE MORTGAGE AS PROMISED.

93.     Throughout the transaction, Barnes always paid as much as he could towards the "option" throughout the year, even though the payments were not due pursuant to the Agreement until September 5th of each year. (*See* Exhibits O and U.) In fact, under the mistaken belief that Defendants were "helping him out," Barnes often paid a substantial portion of the $1,000,000 annual "option" payments months before they were actually due.

94.     Additionally, Barnes always made timely "option," "lease," insurance and tax payments on the Home. (*See* Exhibit T.) Pursuant to the Agreement, Barnes was only allowed three (3) calendar days after receiving written notice of a

late payment from Defendants to pay the full amount due, otherwise Barnes would be considered in default. (See Exhibit O, Addendum to Residential Lease Agreement.) Thus, if Barnes was late on a single payment of $50,000 for "monthly rent," premises costs, or insurance premiums, Barnes would have lost his entire multi-million dollar investment in the Home. (*See* Exhibits O and T.)

95.    Barnes took special care to make timely payments, consistently working more than twelve hours a day, seven days a week and growing mentally and physically exhausted. As the recession continued, the value of the Home dropped well below the contracted price.

96.    After years of paying $50,000 a month in "rent," Barnes asked Defendants to lower his "lease" payments. Barnes knew his next door neighbor was paying approximately $20,000 a month in rent for a home several times larger. However, York refused to negotiate and told Barnes "if you miss a payment, you will lose the Home, so there is nothing to negotiate." York told Barnes that the Home was "his house" and people do not go to banks and ask them to reduce the amount owed on their own homes. York repeatedly told Barnes that in the long run none of this matters because "you and your family are going to live here the rest of your life."

97.    Given Barnes' frustration with the Home's financial commitment *that averaged over $200,000 a month*, Barnes repeatedly requested that Defendants allow him to assume their approximately $45,000 a month mortgage with Bank of America. At first, York would always say that Barnes needed to accumulate more equity —"around one-third." After Barnes had accumulated over 30% of $14,750,000 in equity, York started saying things like "let me check with my partners" and then would fail to call Barnes back or return Barnes' subsequent phone calls. When Barnes did get through, York would try and deflect Barnes from pursuing his line of inquiry regarding assuming the mortgage. York would say things like "we are friends and I am going to help you out, just give me some

time." York would then ask about Barnes' family and compliment them and tell Barnes he was "behaving like a gentleman." Sometimes, Barnes would schedule a meeting with York and York would simply not show up and fail to return phone calls for weeks at a time.

### H.   DEFENDANTS REFUSE TO WORK WITH BARNES AFTER BARNES OBTAINS BANK FINANCING.

98.   After months of frustration, Barnes began searching for his own mortgage through a mortgage broker, Jay Caplan. Barnes soon realized that getting a mortgage was extremely difficult because credit was extremely tight due to the recession.

99.   When Barnes told York he was attempting to get his own mortgage, York explained that he had been in the real estate business a long time and could "guarantee" that no one was going to give Barnes a mortgage. (York failed to express this "professional opinion" in September 2007 when York induced Barnes to enter into the Agreement.) York then told Barnes, for the first time, his opinion that Barnes would need at least $5,000,000 in the bank to get a mortgage. York also explained that Barnes needed to "trust that he was looking out for him," would "help him out at the right time" and needed to "meet with his partners." York told Barnes several times to "not worry," to "settle down" and that York cared about Barnes' family.

100.   For months, Barnes diverted his attention from his business, met with countless banks and bankers, and did everything he possibly could to get a mortgage – and even explored selling his businesses.

101.   In approximately February 2011, after months of back and forth, One West Bank approved Barnes for a loan for $8,400,000. Unfortunately, Barnes needed $9,500,000 to pay off the $14,750,000 purchase price, but could not obtain a loan for that amount because the Home was worth millions less now. Barnes only had approximately $250,000 in cash to put towards the closing.

102.   Barnes tried to open escrow on the Home and formally notified Weiss and Defendants that he was ready to open escrow and planned on closing within a few weeks.  In response, Weiss demanded that Barnes wire $442,000 to escrow within two days to open escrow pursuant to the Agreement.  (*See* Exhibit V.)

103.   Barnes requested that Defendants agree to waive the requirement that Barnes deposit $442,000 into escrow because Barnes did not have this much cash. Plaintiff is informed and believes Defendants never agreed to waive the $442,000 requirement.

104.   Barnes asked York if he and his partners would be willing to carry a second mortgage of $850,000 for approximately six months (the amount less the $250,000 Barnes had that he needed to close the loan).  Since this would not cost Defendants any "out of pocket" money, Barnes believed this was a simple request and felt he had demonstrated to the Defendants his unflinching ability to repay any money borrowed.  By March 2011, Barnes had paid to Defendants $7,364,454.02 in timely "option," "lease," insurance and tax payments on the Home for three and a half years.  Each of these payments was timely and Barnes even prepaid many option payments due under the Agreement.  (*See* Exhibit T.)

105.   York said he would "consider" carrying the loan but that it was a "weird" request and he "needed to check with his partners."  York also told Barnes he was asking for a "huge favor" and "doubted" Defendants would agree to the request because "the timing was not right for them."  Plaintiff is informed and believes that Defendants meant they did not want to pay taxes on the "option" payments Barnes had made since 2007.  Under the Defendants' self-serving interpretation of tax law, once the transaction formally closed, Defendants would immediately be responsible for millions of dollars in federal and state taxes (on the option and other capital-gains related taxes).

106.   York mentioned that Mr. Separzadeh had recently lost money in a Ponzi-scheme involving a man named Ezri Namvar, also known as the "Madoff

of Beverly Hills." Namvar was sentenced to seven years in federal prison for wire fraud in connection with an alleged Ponzi scheme where victims lost as much as $500,000,000, with most of the losses incurred by members of Los Angeles' Iranian-Jewish population.

107.   York asked Barnes to identify the bank that approved the $8,400,000 loan.  Barnes identified One West.

108.   Uncertain if Defendants would help him, Barnes then went to the Carrolls and asked if they would "carry" $475,000 of their commission for approximately six months (their commissions would have been 5% of $9,500,000).  These commissions would have reduced the ultimate purchase price that Barnes needed to pay on the Home by $475,000 and put Barnes in a position where he only would need to pay Defendants approximately $300,000 to close after the proceeds from the One West loan and Barnes' $250,000 were factored in.

109.   Because the Carrolls were entitled to commissions on the "option" payments, they were surprised to learn that Barnes only owed $9,500,000 on the Home at the time.  Barnes explained that over one year before, he had agreed to pay an additional $50,000, which had reduced the purchase price a corresponding amount.  The Carrolls were not and had not been aware of the Amended Agreement.  The Carrolls repeatedly asked Barnes to send them a copy of the Agreement; however, York threatened Barnes and told him that doing so would violate the Agreement and put him in "default."

110.   The Carrolls told Barnes they had not received commissions on the additional option payments.  Plaintiff is informed and believes York had tried to defraud the Carrolls.

111.   In a meeting Barnes and Caplan had with the Carrolls, the Carrolls stated that they did not see any reason why they could not agree to each carry their portion of the commissions but they did not commit during that meeting.

112.   Following the meeting, Barnes called York and told him that he believed the Carrolls would carry $475,000 to facilitate closing.  Barnes asked York if Defendants would now carry only $300,000 for a short period of time.  Despite Barnes' clean payment track record with Defendants, York told Barnes he would not agree to help Barnes but would "check with a friend" to see if Barnes could borrow $300,000 from him instead.  York also told Barnes to let York deal with the Carrolls so that he could get the deal done.

113.   A few days later, Barnes received an impersonal and formal email from Doug Carroll stating the Carrolls would not carry.  In a subsequent phone conversation, Carroll also mentioned that Defendants had just paid the Carrolls their "option" commissions.

114.   Around the same time, York contacted Barnes and told him that he could not find anyone to loan Barnes $300,000.  Defendants refused to carry even $300,000 — despite the fact that it was not going cost them anything out of pocket.

115.   Over a period of over a week, Barnes contacted York and begged him to carry $850,000.  Barnes believed this was a small request since it would not cost Defendants anything out of pocket.  After several weeks, York told Barnes that Defendants would "explore" carrying for a short period of time if Barnes: (1) agreed to sign over all of his companies to them in the event of a default; (2) allow a Uniform Commercial Code filing against all of his companies; (3) agree to a 15% interest rate; and (4) pay Weiss between $25,000 and $30,000 to draw up the loan agreement and do "due diligence" to see if Barnes could afford the $850,000 loan. (*See* Exhibit W.)  (Incredibly, despite Barnes having paid Defendants millions of dollars in a few short years they now questioned his ability to afford payments on a relatively small loan *despite the fact that his monthly payments would now be almost five-times lower*.)

116.   Out of desperation, Barnes agreed to York's terms.

117.   Weiss contacted Barnes and told him he needed to do "due diligence" to make sure that Barnes could afford the $850,000 loan and estimated it would take him at least 50 hours of analysis.  However, before Weiss could do so, he told Barnes that he was "taking a vacation for a week" and would work on the matter when he returned.  In the interim, Weiss demanded a $5,000 retainer to "consider" Barnes' proposal and sent Barnes wire instructions and a retainer agreement.  He told Barnes that it would cost $25,000 to $30,000 (paid by Barnes) for him to draw up the Agreements and do his due diligence.  Barnes explained to Weiss that time was of the essence and expressed frustration at the ridiculousness of the situation since Barnes had already paid over $7,000,000 toward the Home. Weiss was stern and forceful and told Barnes if he did not like it, then he could find someone else to loan him the money. (*See* Exhibit X).  Despite Weiss's condescension towards Barnes, his demand that Barnes pay him a retainer fee when Weiss concurrently represented York (ignoring the obvious conflict of interest in representing Defendants and Barnes in the same transaction).

118.   Although Barnes questioned Weiss' legal ethics in light of his actions, the effects of the recession at the time were still quite severe and it was almost impossible to get a second mortgage on any home.  Barnes, therefore, needed Defendants' help.

119.   Weiss reviewed financials from all of Barnes' companies and indicated he had "serious concerns" due to various "issues."  In reality, Weiss' concerns were inconsequential and non-issues.  For example, Weiss acted shocked that one of the companies had been suspended by the Secretary of State for refusing to pay a small annual registration fee of a few hundred dollars.  Weiss demanded various inconsequential documents, business plans for established small companies, financial records and more.  In one case, Weiss criticized, "as rubbish" and "unacceptable," financial statements for one of Barnes' companies that were drawn up by a team of investment bankers from one of the most

prestigious investment banks in the country. Weiss also demanded better documentation than the multiple pages of financial analysis, pie charts and other information that were put together by Barnes' bankers.

120. After weeks of delay, One West Bank contacted Barnes and said that they could no longer do the loan because the Federal Deposit Insurance Corporation ("FDIC") had suddenly shown up unannounced and was questioning loans they were about to make. They further stated their lending standards had now changed and Barnes could no longer qualify for a mortgage with them unless he had $5,000,000 or more in the bank – the same number York had mentioned.

121. After the episode with One West Bank, Barnes was very upset with Defendants. York blamed everything on the Carrolls' and Weiss. York denied contacting the bank and said he did not understand what had happened. York told Barnes he was sorry and "to give Barnes some relief," *offered to let Barnes skip the next two $50,000 option payments, even though Defendants previously refused to carry $300,000 months earlier*. (*See* Exhibit Y.) York told Barnes that "everything would be fine" and urged him not to leave the Home despite Defendants frustrating and sabotaging his attempts to finance the Home.

**I.    FROM  JUNE THROUGH JULY OF 2011, DEFENDANTS REVEAL THAT THEY ARE IN DIRE FINANCIAL STRAITS, THE MORTGAGE IS NOT ASSUMABLE AND THAT THEY WILL LOSE THE HOME UNLESS BARNES COMES UP WITH MILLIONS MORE.**

122. After the One West episode, Barnes and Caplan began conversing with York more frequently and set up numerous meetings in coffee shops, at the Home and other locations around town.

123. Over the course of several of these meetings, which occurred between June and August of 2011, York told Barnes, Caplan and Barnes' wife that he and his partners had lost several properties to foreclosure and were in extremely poor

financial shape.  In fact, in one meeting York discussed a property that was in foreclosure in Hawaii at the time and his negotiations with a bank regarding the loan.  "I've had to give properties back to the bank" York told Caplan and Barnes.

124.    On another occasion, York told Barnes that his partner, Mr. Separazedah, had been "lounging around his house not doing anything" and "living off his profits from Barnes' option payments for years."  York said that while they had made millions off of Barnes, Mr. Separazedah had stopped working and this had put him in bad financial shape.

125.    At another meeting around this time, York also told Barnes that his mortgage was not assumable and would become "due" in December of the following year. York claimed he was "sorry" and told Barnes that "all of the money you've given us is now gone."  Barnes' multi-million dollar investment into his dream home was "gone" because Defendants never put Barnes' "option payments" into an escrow account.

126.    In an August 2011 meeting, York told Barnes that if Barnes could continue paying $50,000 a month in rent, the taxes, the insurance and the other expenses, as well as, come up with "two, or maybe three million dollars" by the time the mortgage came due, he might be able to "work something out with the bank."  Nevertheless, it was uncertain.  York told Barnes: "I am no longer the $100,000,000 man."  Because York told Barnes Defendants had lost various properties to foreclosure, Barnes was uncertain how they could possibly ever qualify for new financing.

127.    In early August of 2011, Barnes called York and expressed great frustration at all of the lies he had been told.  Barnes told York that he did not think it made sense to deal with Defendants anymore and that he was considering leaving the Home.  York told Barnes that if he did not immediately wire him $100,000 for the monthly option and lease payment then Barnes would lose the Home.  Against Barnes' better judgment, he wired Defendants an additional

$100,000 before it was due.  (One month later Barnes would be homeless and living in a hotel again.)

128.   Barnes and his wife met with York in mid-August of 2011.  In this meeting, Barnes' wife confronted York with the fact that she did not think she could believe anything he said.  During this particular meeting, York now denied ever telling Barnes and his wife that the mortgage was assumable.  York also blamed the financial markets, Weiss, the Carrolls, his partners and others for the situation.  Barnes and his wife realized then that nothing York said was likely to be true and that the story would simply keep changing forever to keep Barnes paying Defendants money as long as possible.  Barnes and his wife also needed to consider the strong likelihood York was likely to lose the Home to foreclosure.

**J.      YORK THROWS A PARTY FOR HUNDREDS OF PEOPLE AT THE HOME, ASKS BARNES TO GO STAY AT A HOTEL AND LEAVES A HUGE MESS FOR BARNES TO CLEAN UP.**

129.   In July of 2011, York contacted Barnes and told him that he wanted to have a Persian Bat Mitzvah for his daughter at Barnes' home and asked Barnes if he, his wife, and his two young daughters would mind going to stay at a hotel while they celebrated.  York told Barnes that "they were friends" and urged Barnes to "help him out" because York was experiencing financial issues.  The party was scheduled for late August of 2011.

130.   York demanded Barnes sign a contract that allowed York to have the party at the Home.  The contract had a blank space for the "price" York was paying and York told Barnes not to write anything in the "blank space" and that York would write in "zero" later after Barnes returned the contract to him.

131.   At this point in time, Barnes was a psychological mess and unable to appreciate the magnitude of what had happened and was happening to him.  For no cost, Barnes allowed York and his family to use the Home.  York told Barnes

there would be "hundreds" of people at the party.  Barnes also paid his own expenses to go stay in a hotel.

132.   Prior to the party, York stopped by unannounced numerous times with his family, party planners and others.

133.   When York stopped by, he ordered around Barnes' gardener telling him that "this is my house and you work for me and not Barnes" and "Barnes is just a renter and you need to listen to me."

134.   The party was so loud and large, the police and neighbors came by numerous times.

135.   Following the party, the grounds of the Home were covered with trash.  It took Barnes and his family over two days to pick up all of the trash on the property.

136.   When Barnes contacted York about the huge mess, York said that his behavior was "cultural" and that Barnes should not worry about it.

137.   Barnes' wife was crying and very upset.  She told Barnes that "these people do not respect you" and this "will never be our home."  Barnes was extremely upset by this episode and (1) believed that he had been defrauded and that (2) York did not have the ability to honor the terms of the Agreement.  As a result, Barnes and his family moved out and into a hotel.

138.   In all, Barnes timely paid **$1,200,000 to Defendants in 2007,** **$1,698,174.24 to Defendants in 2008, $2,060,507.63 to Defendants in 2009,** **$2,305,772.15 to Defendants in 2010, and $653,568.97 to Defendants in 2011,** **totaling $7,918,022.09**. (*See* Exhibit T.)  In addition, Barnes also spent $450,000,000 on improvements for the Home. After all expenditures, Barnes had made a **grand total of $8,368,022.09** in payments toward the Home in four short years.

## VII.  FIRST CAUSE OF ACTION

**(Violation of the Racketeer Influenced and Corrupt Organizations Act – § 18 U.S.C. 1961, et al., – Against all Defendants)**

139.   Plaintiff repeats and incorporates by this reference each and every allegation set forth in paragraphs 1 through 138, inclusive.

### A.   RICO ENTERPRISE

140.   Defendants are individuals and entities capable of holding a legal or beneficial interest in property and therefore are "persons" within the meaning of 18 U.S.C. §1961(3).

141.   Defendants are all capable of holding a legal or beneficial interest in property and therefore are "persons" within the meaning of 18 U.S.C. §1961(3).

142.   Defendants, together with others known and unknown to Plaintiff, including Weiss, have willfully, knowingly and intentionally conducted and are continuing to conduct an illegal enterprise (the "Separzadeh-York Enterprise"). The Separzadeh-York Enterprise includes individuals, partnerships, corporations, and associations all associated in fact although not a legal entity.

143.   The common purpose of the Separzadeh-York Enterprise is to make illegal profits through real estate transactions and the borrowing and lending of money to individuals, associations and corporations as an informal continuing unit.

144.   The Separzadeh-York Enterprise constitutes a RICO "enterprise" within the meaning of 18 U.S.C. §1961(4), in that it includes individuals, partnerships, corporations, associations and other legal entities, and individuals associated in fact engaging in interstate or foreign commerce, and/or the activities of which affect interstate or foreign commerce.

### B.   UNLAWFUL CONDUCT AND PATTERN OF RACKETEERING ACTIVITY

145.   Defendants and others acting in concert with or on their behalf, have engaged in at least two acts indictable by 18 U.S.C. §§ 1343 (relating to wire

fraud) and 1344 (relating to financial institution fraud), and have therefore unlawfully, fraudulently, and intentionally engaged in predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B). Plaintiff is informed and believes such activities in and affecting interstate commerce include, inter alia, tax evasion, the borrowing and lending of money and the purchase and sale of real estate with individuals, associations and corporations nationwide.

146.   As explained in detail above, in September 2007, York instructed Barnes to tell a bank he was a "temporary renter" rather than disclose that he had a multi-million dollar option on the property. In addition, Plaintiff is informed and believes that between September 21, 2007 and October 30, 2007, Defendants withheld information from the title company that was necessary to record the Option Memorandum. Thus, Plaintiff is informed and believes Defendants failed to disclose material information and/or made material misrepresentations to the bank regarding the option and participated in a premeditated and deliberated scheme to defraud a financial institution.

147.   Despite Barnes signing the Amended Agreement on April 11, 2009, and making payments pursuant to that Amended Agreement, on or around August 3, 2010, Barnes discovered that the Option Memorandum recorded on November 9, 2007 had not been amended to reflect the Amended Agreement because Defendants had not executed the Amended Agreement. The Amended Agreement was finally executed on August 30, 2010, after Barnes' attorney harassed Defendants' attorney for weeks. Plaintiff is informed and believes Defendants failed to execute the Amended Agreement for almost seventeen (17) months to prevent the recording of the Amended Option Memorandum which would have made it more difficult for them to illegally use the Home as security for other loans and commitments. Despite executing the Amended Agreement seventeen months later, it was never recorded by Defendants. Thus, Plaintiff is informed and believes Defendants failed to disclose material information and/or

1  made material misrepresentations to banks regarding the Amended Option and

2  knowingly participated in a scheme to defraud financial institutions and others.

3       148.    Furthermore, in or around September 2007, York was in Hawaii and

4  called Barnes.  During the telephone call, York represented that structuring the

5  Agreement with "option" payments would allow Plaintiff to build up enough

6  equity to qualify for financing of the Home.

7       149.    During several telephone conversations between Barnes and York

8  between October 2007 and August 2011, York referred to himself and his partners

9  as "a bank" and referred to Plaintiff as "the owner" of the Home.  During this

10  time, York represented and promised Barnes that the Defendants would be willing

11  and able to allow Barnes to assume their mortgage on the Home.  Plaintiff is

12  informed and believes York made some of these telephone calls while he was

13  outside of California.  Plaintiff is informed and believes York knew his

14  representations and promises were false because, contrary to his previous

15  representations and promises, York informed Barnes in August 2011 that the

16  mortgage was not assumable and would become "due" in December of the

17  following year.  These representations, opinions, concealments and/or promises

18  were material facts essential to the analysis undertaken by the Plaintiff and

19  directly affected the purpose for which Plaintiff acted.  Plaintiff is informed and

20  believes that Defendants, acting in concert, made these representations, opinions,

21  concealments and/or promises to Plaintiff with the intent to induce Plaintiff to act

22  or alter his position in reliance upon the representations, opinions, concealments

23  and/or promises.  Plaintiff's reliance upon these representations, opinions,

24  concealments and/or promises of Defendants, acting in concert, was reasonable

25  and justified under the circumstances.  Plaintiff did not discover Defendants'

26  representations, opinions, concealments and/or promises were false until August

27  2011.

28

FIRST AMENDED COMPLAINT; DEMAND FOR JURY TRIAL

150.    The racketeering activities listed above constitute a pattern of racketeering activity pursuant to 18 U.S.C. §1961(5).

151.    Plaintiff is informed and believes Defendants used and invested income that was derived from a pattern of racketeering activity in an interstate enterprise in violation of 18 U.S.C. § 1962(a).

152.    Plaintiff is informed and believes Defendants, through an intricate web of partnerships, corporations, or other associations, have acquired or maintained, directly or indirectly, an interest or control in an enterprise which affects interstate commerce through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962 (b).

153.    Plaintiff is informed and believes Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(c).

154.    As set forth above, Defendants agreed and conspired to violate 18 U.S.C. § 1962(a), (b), and (c).

155.    Each use of wires in furtherance of the Defendants' scheme and artifice to defraud the Plaintiff and financial institutions, and in furtherance of the criminal acts set forth herein, constitutes a separate offense.

C.    **CONTINUITY AND RELATEDNESS OF THE PATTERN OF RACKETEERING**

156.    Each of the aforementioned repeated acts of racketeering by Defendants and those acting on their behalf was continuous and spanned over the four year period of September 2007 through September 2011.

157.    Each of the aforementioned repeated acts of racketeering by Defendants were part of a pattern of conduct related to the common purpose of the Separzadeh-York Enterprise of making illegal profits through real estate

1  transactions and the borrowing and lending of money to individuals, associations

2  and corporations.

3      158.   Plaintiff is informed and believes the Separzadeh-York Enterprise

4  has directed this pattern of conduct towards multiple victims, and engaged in

5  related past and/or present criminal or fraudulent activity for the same or similar

6  purposes, to achieve the same or similar results, involving the same or similar

7  participants or victims, employing the same or similar methods of commission, or

8  involving any other interrelated, distinguishing characteristics constituting a

9  pattern.  Plaintiff is informed and believes Peter Frommer and Peter Frommer's

10  Ponzi-scheme victims were also targets of the Separzadeh-York Enterprise's

11  scheme, which have continued over a substantial period of time.

12      159.   Plaintiff is informed and believes the common purpose of the

13  Separzadeh-York Enterprise remains and continues to be the making and

14  receiving of illegal profits through real estate transactions and the borrowing and

15  lending of money to individuals, associations and corporations.

16      160.   Plaintiff is informed and believes that the aforementioned repeated

17  acts of racketeering by Defendants pose a specific threat of repetition expending

18  indefinitely into the future as Defendants continue to engage in real estate

19  transactions, to borrow and lend money to individuals, associations, or

20  corporations, and to partake in any other racketeering activities related to their

21  ongoing "legitimate" business or contemplated and established RICO enterprise;

22  thereby posing a substantial risk of harm to the property interests of others.

23      161.   Plaintiff is informed and believes that the aforementioned repeated

24  acts of racketeering by Defendants are representative of the Separzadeh-York

25  Enterprise's regular way of doing business.

26      **D.    RICO INJURY**

27      162.   As a direct and proximate result of Defendants' racketeering

28  activities, Plaintiff has been injured in his business and property in that he lost

-38-

$8,343,022.09 stemming from Defendants' violations of 18 U.S.C. §§ 1343 and 1344, their overt acts committed in furtherance of the conspiracy and their investment of racketeering income.

163.   Plaintiff's injuries were the preconceived purpose, design and/or the specifically intended consequence, and/or a highly foreseeable result of the Defendants' racketeering acts.

164.   Plaintiff was a target of the Separzadeh-York Enterprise scheme to make illegal profits through real estate transactions and the borrowing and lending of money to individuals, associations and corporations.

165.   As a direct and proximate result of Defendants' conduct, Plaintiff is entitled to a complete accounting of all funds received and/or disbursed, with respect to which the Plaintiff has an interest to, and treble damages believed to be in the sum of $25,029,066.27 plus prejudgment interest at a rate of at least 7%, costs of suit and attorneys' fees totaling in excess of $5,000,000, together with any special, consequential or resulting damages.

166.   Plaintiff is entitled to an award of punitive damages because, Defendants, in concert, acted with oppression, fraud and malice when making these representations, opinions, concealments and/or promises.

## VIII.  SECOND CAUSE OF ACTION
### (Fraud Against all Defendants)

167.   Plaintiff repeats and incorporates by this reference each and every allegation set forth in paragraphs 1 through 166, inclusive.

168.   In or around September 2007, Defendants, acting in concert, represented that structuring the contract with "option" payments would allow Plaintiff to build up enough equity to qualify for financing of the Home.

169.   In or around September 2007, Defendants, acting in concert, represented and promised they would be willing and able to provide financing for

the properties through a traditional promissory note if Plaintiff made payments to Defendants to build "equity" in the Home.

170.   In or around October 2007 through August 2011, Defendants, acting in concert, represented and promised they would be willing and able to allow Plaintiff to assume their mortgage on the Home.

171.   Defendants, acting in concert, at all times prior to and up to September 2011, referred to themselves as "a bank."

172.   Defendants, acting in concert, referred to Plaintiff as "the owner" of the Home, at all times between September 2007 and August 2011.

173.   In approximately May of 2009, York represented that Barnes could assume the mortgage if he increased his "option" payments, urged Barnes to do so quickly, and then induced Barnes to executed the Amended Agreement.

174.   Plaintiff is informed and believes that these representations, opinions, concealments and/or promises were false.

175.   Plaintiff is informed and believes that Defendants knew these representations, opinions, concealments and/or promises were false, or were made in reckless disregard for the truth.

176.   These representations, opinions, concealments and/or promises were material facts essential to the analysis undertaken by Plaintiff and directly affected the purpose for which Plaintiff acted.

177.   Plaintiff is informed and believes that Defendants, acting in concert, made these representations, opinions, concealments and/or promises to Plaintiff with the intent to induce Plaintiff to act, or alter his position in reliance upon the representations, opinions, concealments and/or promises.

178.   Plaintiff's reliance upon these representations, opinions, concealments and/or promises of Defendants, acting in concert, was reasonable and justified under the circumstances.

179.   Plaintiff did not discover Defendants' representations, opinions, concealments and/or promises were false until August 2011.

180.   As a result of these representations, opinions, concealments and/or promises, Plaintiff has been damaged in an amount to be determined according to proof at trial, but currently believed to be in the sum of $8,343,022.09 plus prejudgment interest at a rate of at least 7% pursuant to, but not limited to, Cal. Civ. Code. §§ 3287 and 3288, together with any special, consequential or resulting damages.

181.   As a result of these representations, opinions, concealments and/or promises, Plaintiff has suffered emotional distress damages.

182.   Defendants, acting in concert, acted with oppression, fraud and malice when making these representations, opinions, concealments and/or promises and Plaintiff is thus entitled to an award of punitive and exemplary damages.

## IX.   THIRD CAUSE OF ACTION
### (Negligent Misrepresentation Against all Defendants)

183.   Plaintiff repeats and incorporates by this reference each and every allegation set forth in paragraphs 1 through 182, inclusive.

184.   The representations, opinions, concealments and/or promises by Defendants, acting in concert, made as stated in paragraphs 168-173 of the Complaint herein were material facts essential to the analysis undertaken by the Plaintiff and directly affected the purpose for which Plaintiff acted.

185.   Defendants, acting in concert, made these representations, opinions, concealments and/or promises without any reasonable grounds for believing them to be true.

186.   Plaintiff is informed and believes that Defendants, acting in concert, made these representations, opinions, concealments and/or promises to Plaintiff

1   with the intent to induce Plaintiff to act or alter his position in reliance upon the

2   representations, opinions, concealments and/or promises.

3       187.   Plaintiff's reliance upon these representations, opinions,

4   concealments and/or promises of Defendants, acting in concert, was reasonable

5   and justified under the circumstances.

6       188.   Plaintiff did not discover Defendants' representations, opinions,

7   concealments and/or promises were false until August 2011.

8       189.   As a result of these representations, opinions, concealments and/or

9   promises, Plaintiff has been damaged in an amount to be determined according to

10   proof at trial, but currently believed to be in the sum of $8,343,022.09 plus

11   prejudgment interest at a rate of at least 7% pursuant to, but not limited to, Cal.

12   Civ. Code. §§ 3287 and 3288, together with any special, consequential or

13   resulting damages.

14       190.   Defendants, acting in concert, acted with oppression, fraud and

15   malice when making these representations, opinions, concealments and/or

16   promises and Plaintiff is therefore entitled to an award of punitive and exemplary

17   damages.

## X.  FOURTH CAUSE OF ACTION
### (Declaratory Relief Against all Defendants)

20       191.   Plaintiff repeats and incorporates by this reference each and every

21   allegation set forth in paragraphs 1 through 190, inclusive.

22       192.   An actual controversy exists among Plaintiff and Defendants, in that

23   Plaintiff contends:

24           (a)   The agreement between Plaintiff and Defendants regarding the

25               Home is void because it was illegal, unconscionable and

26               fraudulent;

27           (b)   If the agreement between Plaintiff and Defendants regarding

28               the Home is not void, the agreement was one of purchase

-42-