TOM LALLAS (SBN: 66512)
   tlallas@lsl-la.com
MARK D. HURWITZ (SBN: 151159)
   mhurwitz@lsl-la.com
LEVY, SMALL & LALLAS
A Partnership Including Professional Corporations
815 Moraga Drive
Los Angeles, CA  90049
Telephone:  (310) 471-3000
Facsimile:   (310) 471-7990

Attorneys for Defendants


# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| A. HARRISON BARNES, individually and on behalf of the A. Harrison Barnes Trust-2005;<br><br>                        Plaintiff,<br><br>          v.<br><br>CROWN JEWELS, LLC, a California limited liability company; KONA CROWN HOLDINGS, LLC, a California limited liability company; MALIBU INVESTMENT GROUP, LP, a California limited partnership; 32430 PCH, LLC, a California limited liability company; REPUBLIC WESTERN INVESTMENTS CO, LLC, a California limited liability company; MAYER SEPARZADEH, an individual; DAVID YORK, an individual; ANNETTE SEPARZADEH, an individual; and DOES 1 through 10, inclusive,<br><br>                        Defendants. | **Case No. 2:14-cv-4098-ODW (MRWx)**<br><br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATIONS FOR WRIT OF ATTACHMENT**<br><br><br><br>Date:       March 2, 2016<br>Time:       9:30 a.m.<br>Courtroom:  550, Roybal Building<br><br>*Honorable Michael R. Wilner,*<br>   *United States Magistrate Judge* |

LEVY, SMALL & LALLAS
A PARTNERSHIP INCLUDING
PROFESSIONAL CORPORATIONS
815 MORAGA DRIVE
LOS ANGELES, CA 90049

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................. iii

I.   INTRODUCTION ............................................................................ 1

II.  THE APPLICATION MUST BE MADE TO THE ARBITRATOR ............. 3

III. BARNES FAILED TO ESTABLISH THAT ANY ARBITRATION AWARD WOULD BE RENDERED INEFFECTUAL WITHOUT PROVISIONAL RELIEF .................................................................. 4

IV.  BARNES FAILED TO PROVE THAT HE WILL LIKELY SUCCEED ON ANY OF HIS CLAIMS AT ARBITRATION ..................... 6

    A.  Barnes Cannot Recover the Option Payments on any Theory Because they Are Exceeded by the Decline in Market Value .............. 6

    B.  Barnes Is Not Entitled to Recover the Option Payments on the Mistaken Theory that His Purported Exercise of the Option Terminated that Agreement ......................................................... 7

        1.  <u>Barnes Never Exercised the Option</u> ........................... 8

        2.  <u>A Defaulting Purchaser May Not Recover Option Payments as a Consequence of His Default</u> .................... 11

    C.  The Option Agreement Was Exactly that—an Option to Purchase, Not A "Disguised" Purchase Agreement .......................... 14

    D.  The Option Agreement Is Not a Real Property Sales Contract .......... 18

    E.  Requiring Barnes to Honor His Commitments Does Not Result in a Forfeiture ................................................................ 21

    F.  Barnes Cannot Recover the Other Amounts He Seeks ...................... 22

V.   NO ATTACHMENT MAY ISSUE AGAINST YORK AND REPUBLIC ................................................................................... 24

VI.  NO ATTACHMENT MAY ISSUE AGAINST THE INDIVIDUAL DEFENDANTS .............................................................................. 24

VII. CONCLUSION ............................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*Allen v. Smith*, 94 Cal.App.4th 1270 (2002) ........................................................ 13, 17

*Barton v. White Oak Realty, Inc.*, 271 Cal.App.2d 579 (1969) ................................ 7

*Behrendt v. Abraham*, 64 Cal.2d 182 (1966) ........................................................ 20

*Caplan v. Schroeder*, 56 Cal.2d 515 (1961) .......................................................... 20

*Cates v. McNeil*, 169 Cal. 697 (1915) ................................................................... 12

*China National Metal Products Import/Export Co. v. Apex Digital, Inc.*,
   141 F.Supp.2d 1013, 1028 (C.D. Cal. 2001)

*China National Metal Products Import/Export Co. v. Apex Digital, Inc.*,
   155 F.Supp.2d 1174 (C.D. Cal. 2001) .......................................................... 3, 5

*Cook v. King Manor and Convalescent Hospital*, 40 Cal.App.3d 782 (1974) ....... 17

*Dealer Computer Services, Inc. v. Monarch Ford*,
   2013 WL 314337 (E.D. Cal. 2013) ..................................................................... 4

*Ebbert v. Mercantile Trust Co.*, 213 Cal. 496 (1931) ...................................... 21, 22

*Erich v. Granoff*, 109 Cal.App.3d 920 (1980) ...................................................... 12

*Freedman v. Rector, Wardens & Vestrymen of St. Mathias Par.*,
   37 Cal.2d 16 (1951) .......................................................................................... 20

*Granberry v. Islay Investments*, 9 Cal.4th 738 (1995) .......................................... 23

*Gray1 CPB, LLC v. Kolokotronis*, 202 Cal.App.4th 480 (2011) ............................. 3

*Holiday Inns of America, Inc. v. Knight*, 70 Cal.2d 327 (1969) ........................... 16

*Honey v. Henry's Franchise Leasing Corp. of Am.*,
   64 Cal.2d 801 (1966) .................................................................................. 20, 21

*Jenkins v. Tuneup Masters*, 190 Cal. App. 3d 1 (1987) ......................................... 9

*Loeb & Loeb v. Beverly Glen Music, Inc.*, 166 Cal.App.3d 1110 (1985) ............... 6

*Kuish v. Smith*, 181 Cal.App.4th 1419 (2010) ....................................................... 7

*Millgee Investment Co. v. Friedrich*, 254 Cal.App.2d 802 (1967) ........................ 17

*Nakasone v. Randall,* 129 Cal.App.3d 757 (1982) ........................................... 24, 25

*Palo Alto Town & Country Village, Inc. v. Bbtc Co.*, 11 Cal.3d 494 (1974) .......... 18

*Petersen v. Hartell,* 40 Cal.3d 102 (1985) ............................................................ 19

*Riverside Fence Co. v. Novak*, 273 Cal.App.2d 656 (1969) .................................. 15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Rodriguez v. Barnett*, 52 Cal.2d 154 (1959) .................................................. 17

*Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal.App.4th 221 (2014) ........... 23

*Schomaker v. Osborne*, 258 Cal.App.2d 887 (1967) ..................................... 12

*Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716 (9th Cir. 1999) ............................. 3, 4

*Smith v. Morton*, 29 Cal.App.3d 616 (1972) ............................................... 16

*Steiner v. Thexton*, 48 Cal.4th 411 (2010) ........................................ 14, 15, 16

*Subsea Robotics, LP v. Schilling Robotics, LLC*,
    2013 WL 6503344 (E.D. Cal. 2013) .................................................. 5

*Toyo Tire Holdings of Americas Inc. v. Continental Tire North America, Inc.*,
    609 F.3d 975 (9th Cir. 2010) .............................................................. 4

**STATUTES**

Civil Code

      Sections 1675-1681 ...................................................................... 13

      Section 1677 .................................................................................. 12

      Section 1681 .................................................................................. 13

      Section 1950.5 ............................................................................... 23

      Section 1950.5(g) .......................................................................... 23

      Section 2985 ........................................................................ 2, 13, 19

      Section 2985(a) ............................................................................. 18

      Section 3275 ........................................................................... 21, 22

      Section 3307 .................................................................................... 7

Code of Civil Procedure

      Section 1281.8(b) ............................................................................ 5

      Section 481.190 ............................................................................... 6

      Section 483.010 ........................................................................ 24, 25

      Section 483.010(a) ........................................................................ 24

      Section 484.090(a)(2) ....................................................................... 6

## I.    INTRODUCTION

Back in August 2007, Plaintiff A. Harrison Barnes, individually and on behalf of the A. Harrison Barnes Trust-2005 ("Barnes"), happened by a stunning Malibu beach property, consisting of a residence and an adjacent lot, listed for sale at $15.9 million that he decided he just had to have. Unable to afford the purchase price, Barnes, an experienced attorney and sophisticated businessman, proposed to lease the property with the exclusive option to purchase, which he could exercise any time in the succeeding several years. The property owners (the "Owners") agreed to Barnes' lease/option proposal, committing themselves to sell for $14.75 million at an unspecified future date within four years, and to defer receipt of the cash proceeds an immediate outright sale would have generated for them.

What happened next is unfortunately too well known: the real estate market soon suffered a devastating downturn. Barnes, however, rather than cutting his losses, elected to continue making option payments to preserve his right to purchase the property while the market steadily deteriorated. After four years of doing so, he was unable to obtain the financing necessary to close on the transaction. He moved out of the property and the option terminated.

Nearly three years after he terminated the option, Barnes filed this action, improperly seeking to shift to the Owners the consequences of his decision to continue making option payments in a rapidly falling market. While his claims are the subject of a Court-ordered arbitration proceeding that is now pending, he comes back to this Court, almost two years after filing this action, seeking an attachment of over $10 million. The attachment application should be denied for the following reasons:

- The Hon. Carl J. West (Ret.) has been appointed arbitrator of the claims on which the attachment is sought, and pursuant to the arbitration agreement has exclusive jurisdiction to hear and determine the application.

- An attachment may not issue on a claim in arbitration unless the arbitration would be rendered ineffectual in the absence of such relief, a showing that Barnes has not made.

LEVY, SMALL & LALLAS
A PARTNERSHIP INCLUDING
PROFESSIONAL CORPORATIONS
815 MORAGA DRIVE
LOS ANGELES, CA 90049

1

- Barnes has failed to establish the probable validity of his claim that the option payments were actually prohibited liquidated damages, a penalty, or a forfeiture under any of his ill-founded theories:
  - Barnes refuses to acknowledge that even if his theories were correct, which they are not, the Owners are entitled to the benefit of their bargain because Barnes was the party who failed to perform; he has no claim to recover the option payments because they are exceeded in amount by the decline in the property's value.
  - Barnes never exercised the option, so the purchase agreements on which the liquidated damages arguments depend never became effective.
  - Even if Barnes had exercised the option, which he did not, such exercise would not entitle him to a refund of the option payments, but only to a credit of the amount of such payments to the purchase price—if and only if he completed the purchase, which he did not.
  - The carefully crafted option agreement, lease agreement, and purchase agreements accurately evidenced the parties' intent that the transaction was structured as a true option, and was not, and was never intended to be, a disguised purchase transaction.
  - The Option Agreement was not transmuted by Civil Code Section 2985 into an installment contract or otherwise involved a forfeiture.
- Barnes has failed to establish any basis for recovery of amounts claimed due under the lease.
- In no event may attachments issue against defendants David York or Republic Western Investments Co., who are not parties to any contract with Barnes, or the individual defendants, because Barnes has failed to establish the alleged debt arose out of their trade, business or profession.

1    Barnes obviously now regrets the deal that he proposed and made in 2007—
2    before anyone was aware of the imminent collapse of the real estate market—to tie up
3    the property he coveted against the hope that he would one day, within the option
4    term, be able to afford it. The Owners too wish they had sold the property outright
5    back in 2007 to someone else, rather than lease it to Barnes, and been able to realize
6    the property's full value at that time. But the lease/option is the deal the parties made.
7    Barnes' effort to change the fundamental nature of that deal through litigation is
8    groundless. As the court aptly observed in *Grayl CPB, LLC v. Kolokotronis*, 202
9    Cal.App.4th 480 (2011), "We cannot rewrite contracts when the economy suffers a
10   severe downturn." *Id.* at 482. The applications should be denied in their entirety.

11   **II.    THE APPLICATION MUST BE MADE TO THE ARBITRATOR**

12           The parties' arbitration agreement specifically provides that the arbitrator, not
13   the Court, may issue provisional remedies. Thus, the agreement provides in part:

14           The arbitrator shall be empowered . . . to provide all temporary
15           and/or provisional remedies.

16           [Ex. G to Barnes Dec. at ¶ 6.]

17           On October 1, 2014, this Court ordered this action to arbitration. [ECF 31.]
18   The Honorable Carl J. West (Ret.) has been appointed arbitrator, and therefore has
19   exclusive jurisdiction to hear the attachment application. Where, as here, all of a
20   party's claims are subject to arbitration, "it would have been inappropriate for the
21   district court to grant preliminary injunctive relief." *Simula, Inc. v. Autoliv, Inc.*, 175
22   F.3d 716, 726 (9th Cir. 1999). Because the parties agreed that the arbitrator had the
23   authority to issue provisional remedies, the Court "has no authority to grant a pre-
24   arbitral award writ of attachment." *China National Metal Products Import/Export Co.*
25   *v. Apex Digital, Inc.*, 155 F.Supp.2d 1174, 1182 (C.D. Cal. 2001). Indeed, in *China*
26   *National*, the Court reached this conclusion even though the petitioner may not have
27   been able to obtain a writ of attachment under the provisions of the parties' arbitration
28   agreement. See *id.* ("[W]hether or not China National can ultimately obtain a writ of

1  attachment under [the provisions the parties' arbitration agreement] is irrelevant to the
2  question whether this court can award such relief"); *Dealer Computer Services, Inc. v.*
3  *Monarch Ford*, 2013 WL 314337, at *4 (E.D. Cal. 2013) (holding that application for
4  writ of attachment "fails as a matter of law at a threshold level" because that power
5  had been designated to the arbitrator and the arbitration was already underway).

6        The arbitrator's appointment here provides the critical distinction between this
7  case and the one on which Barnes relies, *Toyo Tire Holdings of Americas Inc. v.*
8  *Continental Tire North America, Inc.*, 609 F.3d 975 (9th Cir. 2010). There, the Ninth
9  Circuit distinguished *Simula* and held that the court had the authority to grant
10  provisional relief, even when that authority was also granted to the arbitrator, when it
11  was necessary "to preserve the status quo until the arbitration panel can consider and
12  rule upon [petitioner's] application for interim relief." In *Toyo Tire*, the petitioner
13  filed its request for provisional relief with the court before the arbitration panel had
14  been selected. Therefore, there was concern that delay in appointing the arbitrators
15  and seeking relief from the panel "could defeat any ultimate award" and "frustrate the
16  arbitration process." *Id.* at 982.

17        Here, by contrast, the arbitrator has been appointed, and has actively
18  conducted scheduling conferences. Nothing precludes Barnes from making the
19  attachment application to Judge West; to the contrary, he is required to do so under the
20  plain terms of the arbitration agreement. Further, unlike in *Toyo Tire*, issuance of
21  provisional relief—a harsh pre-judgment attachment—would radically alter the status
22  quo to Defendants' considerable prejudice. The application should be denied.

23  **III.   BARNES FAILED TO ESTABLISH THAT ANY ARBITRATION**
24          **AWARD WOULD BE RENDERED INEFFECTUAL WITHOUT**
25          **PROVISIONAL RELIEF**

26        Even if this Court could properly consider the application, which it cannot, no
27  attachment should issue because Barnes failed to make the threshold showing to
28  obtain an attachment in an arbitrated matter. Where, as here, an attachment application

1   is made based upon claims pending in arbitration, the applicant must demonstrate that
2   the arbitration award "may be rendered ineffectual without provisional relief." Code
3   of Civil Procedure Section 1281.8(b).

4       Federal courts within California have applied this state rule of law in federal
5   cases. *China National Metal Products Import/Export Co. v. Apex Digital, Inc.*, 141
6   F.Supp.2d 1013, 1028 (C.D. Cal. 2001) (petitioner must demonstrate that arbitration
7   award would be rendered "ineffectual" in order to obtain writ of attachment while
8   arbitration is pending), *order set aside on other grounds*, 155 F.Supp.2d 1174 (C.D.
9   Cal. 2001)[1]; *Subsea Robotics, LP v. Schilling Robotics, LLC*, 2013 WL 6503344, at *2
10  (E.D. Cal. 2013) ("irreparable injury is an essential element under California law to
11  issue a writ of attachment in the arbitration context").

12      Barnes has failed to establish that in the unlikely event he obtains an
13  arbitration award in his favor, such award would be rendered ineffectual without
14  issuance of an attachment. Although he speculates that Defendants may attempt to
15  hide their assets, he offers no evidentiary support whatsoever to support his paranoid
16  imaginings. It must not be forgotten that he filed this action almost two years ago,
17  based upon a business relationship that terminated more than four years ago. Were he
18  genuinely concerned that his lawsuit would trigger concealment of assets, he would
19  have made this application long ago.

20      In any event, Barnes has filed a *lis pendens* on the Malibu property, which
21  militates against any argument that the arbitration award would be rendered
22  ineffectual without an attachment.[2]

23

---

24  [1] The order was set aside on the ground that the magistrate judge improperly issued
25  the attachment because the application should have been made to the arbitrator, as
26  discussed in Part II above.

27  [2] Defendants maintain the *lis pendens* was wrongfully recorded and reserve the right
    to seek expungement. However, unless and until the *lis pendens* is expunged, it
28  provides Barnes with a measure of security that undermines any argument that an
    arbitration award would be rendered ineffectual absent the attachment.

1    Simply put, Barnes has not demonstrated that any award would be rendered
2    ineffectual in the absence of the attachment. For this additional reason, the application
3    must be denied.

4    **IV.   BARNES FAILED TO PROVE THAT HE WILL LIKELY SUCCEED**
5    **ON ANY OF HIS CLAIMS AT ARBITRATION**

6    Even if the Court were to consider the attachment applications, which it
7    should not for the reasons set forth above, no attachment may issue. Under CCP
8    Sections 484.090(a)(2) and 481.190, Barnes must establish that "it is more likely than
9    not that the party will obtain a judgment against the defendant on the claim." It is
10   plaintiff's burden to establish the probable validity of his claim. *Loeb & Loeb v.*
11   *Beverly Glen Music, Inc.,* 166 Cal.App.3d 1110, 1116 (1985). As demonstrated below,
12   Barnes has failed to discharge that burden.

13   **A.   Barnes Cannot Recover the Option Payments on any Theory**
14   **Because they Are Exceeded by the Decline in Market Value**

15   Barnes has assembled a series of wild and speculative theories as to why he
16   should not have to bear the consequences of, and honor his obligations under, the
17   transactions into which he willingly entered, and why the option payments should
18   simply be refunded to him. By variously arguing that the option payments are actually
19   installment payments under a purchase agreement, or constitute illegal liquidated
20   damages, or amount to a penalty or forfeiture, he ignores the two dispositive and
21   undeniable facts that doom his claims: *he* was the party that was unable to perform
22   because he could not come up with sufficient funds to purchase the property, and the
23   market moved against him in the four years that he was leasing the property.

24   If, as Barnes argues under several theories, it is improperly assumed that the
25   Option Agreement were actually a purchase contract, then Barnes breached it by
26   failing to conclude the purchase. The Owners were at all times ready, willing, and able
27   to perform, but Barnes could not come up with the financing that would allow him to
28   buy the property. After Barnes' failure to conclude the purchase, the Owners were left

-6-

with a property that had been worth at least the $14.75 million purchase price in September 2007, but as of September 2011, after the brutal crash of the real estate market, was worth no more than $9 million.[3] (Declaration of David York ("York Dec.", ¶¶ 34-53, 70-72; Appendix of Exhibits ("App.") Exs. 16-41; Ex. 85.)

As the breaching party, Barnes is liable for the Owners' damages. Under Civil Code Section 3307, the measure of damages recoverable from a defaulting buyer on a real estate transaction is "the excess, if any, of the amount which would have been due to the seller under the contract over the value of the property" plus other damages and interest. Accounting only for the diminution in value that the Owners could recover from Barnes (the $5.75 million difference between the $14.75 purchase price and the maximum $9 million value as of September 2011), the Owners' damages exceed the $5.45 million of option payments. *Barton v. White Oak Realty, Inc.*, 271 Cal.App.2d 579, 581 (1969) (measure of damages for buyer's breach of contract to purchase real estate is the difference between the purchase price and the market value at the time of the breach); *Kuish v. Smith*, 181 Cal.App.4th 1419, 1429 (2010) (in absence of valid liquidated damages clause, in a falling market deposit would be nonrefundable to extent defendants showed damages under Section 3307). Adopting Barnes' ill-founded theories serves only to establish the Owners' right to retain the option consideration—that is the beginning and the end of the analysis. Since Barnes has failed to demonstrate any probability, or even possibility, of prevailing on his claim to recover the option consideration, the application must be denied.

**B.    Barnes Is Not Entitled to Recover the Option Payments on the Mistaken Theory that His Purported Exercise of the Option Terminated that Agreement**

Barnes argues that he is entitled to a return of the option consideration because he exercised the option, thereby purportedly terminating the Option

---

[3]Barnes himself stated back in September 2011 that the property was then appraising at between $9 million and $10 million. App., Ex. 85.

-7-

Agreement and giving birth to enforceable purchase agreements. As discussed immediately above, acceptance of his argument would only establish his liability for breach of such purchase agreements, and the Owners' right to retain the option payments because the decline in the property's value was greater in amount. But in any event, Barnes' argument is devoid of merit for two reasons:   (a) Barnes never exercised the option; and (b) even if he had, he was not entitled to recover the option consideration after defaulting on the alleged purchase agreements.

## 1.    Barnes Never Exercised the Option

Remarkably, although Barnes testified under penalty of perjury that he exercised the option, he provides no documentary evidence whatsoever that he actually did so. The only writing he offers bearing on the issue was a vaguely worded email in which he masked his intentions. On January 27, 2011, Barnes sent an email to York and the Owners' attorney, Robert Weiss ("Weiss") stating:

> I wanted to let you know that I am planning on exercising the option and closing on tl *[sic]* in the next 2-4 weeks. We anticipate closing on the property no later than 30 days from today.

> App., Ex. 14.

The foregoing email announced nothing more than what Barnes planned to do, not that he was actually exercising the option. A valid exercise would have required an unambiguous statement that Barnes was in fact exercising the option, ***delivered in the manner specified in the Option Agreement***. Pursuant to Paragraph 6 of the Option Agreement, Barnes could exercise the option only "by concurrently delivering (i) written notice of [his] intention to do so (an "Option Notice") to the Designated Agent …; and (ii) signed and dated counterparts of the Home Purchase Agreement and the Lot Purchase Agreement (collectively the "Purchase Agreements") to the designated escrow officer."  (Option Agreement, p. 2 [Ex. C to Barnes Dec.; ECF 44-3 at page ID: #2035.)

1    Barnes' statement that he "planned" to exercise the option is not notification

2    of his actual intent to exercise the option, a fact Weiss pointed out to Barnes shortly

3    thereafter. In a February 9, 2011 email from Weiss to Barnes, Weiss stated:

4         I am confident you recognize there is a significant difference

5         between "planning" to exercise the option (the "Option") and doing

6         so in accordance with the amended September 5, 2007 Option

7         Agreement among the Trust and the Property owners (the

8         "Agreement"). The requisite formalities are in paragraph 6 of the

9         Agreement (which is at the bottom of the second page and the top of

10        the third page). Copies of both pages are attached to this message for

11        your convenience.

12    App., Ex. 67.

13    Notwithstanding Weiss's clear statement that the email did not constitute

14    proper notice of exercise, Barnes never responded with a definitive statement of his

15    intent to exercise the option. (Declaration of Robert Weiss ("Weiss Dec."), ¶¶ 22-23.)

16    Further, Barnes' vague email could not constitute exercise of the option

17    because it was not delivered in the manner mandated by the Option Agreement. As

18    shown above, paragraph 6 required delivery to the Designated Agent, which was

19    32430 PCH, LLC. Paragraph 14 of the Option Agreement required that the notice of

20    exercise be delivered to the Designated Agent personally, by overnight mail, by

21    regular mail, or by facsimile—***but not by email***. (Ex. C to Barnes Dec.; ECF 44-3 at

22    page ID: #2038-2039.) Barnes' email indicating his "plan" to exercise the option did

23    not satisfy the notice requirement, and his failure to provide the contractually required

24    notice further signifies that he did not intend the vague email to constitute notice of

25    exercise. (York Dec., ¶¶ 23-29, 33; Weiss Dec., ¶ 28.)

26    Where, as here, the mode of acceptance of an option is prescribed, it must be

27    strictly followed. *Jenkins v. Tuneup Masters*, 190 Cal. App. 3d 1, 7 (1987). Barnes not

28    only failed to exercise the option in the manner specified in the Option Agreement,

1   but he also never challenged the Owners' understanding that Barnes had not yet
2   exercised the option. For Barnes to claim, five years later, that he in fact did exercise
3   the option because it now advances his argument speaks volumes as to his credibility.

4            There was a very good reason why Barnes did not wish to clarify that he was
5   actually exercising the option: the requirement under the purchase agreements to
6   deliver $442,500 in down payments within two business days after exercising the
7   option. (Ex. E to Barnes Dec. at ¶ 2.3.) Barnes failed to make any deposits within two
8   business days after January 27, 2011, or at any other time. (York Dec., ¶¶ 31-32;
9   Weiss Dec., ¶ 30.) Clearly, Barnes (again, back in 2011) did not intend his email to
10  constitute notice of the exercise of the option.

11           The January 27, 2011 email did not constitute a valid exercise of option for
12  yet another reason: Barnes' failure to deliver executed copies of the purchase
13  agreements to escrow. Paragraph 6 of the Option Agreement required Barnes to
14  deliver such signed copies to the escrow holder concurrently with sending notice of
15  exercise. (Ex. C to Barnes Dec. at pp. 6-7) Although Barnes states that he signed the
16  purchase agreements and opened escrow (but fails to provide any documentary
17  evidence that he did either), he carefully avoids stating that he ever delivered to
18  escrow the signed copies of the purchase agreements.

19           In short, Barnes never exercised his option to purchase the property. The
20  Option Agreement continued in full force and effect until its termination in September
21  2011. Under paragraph 9 of the Option Agreement, upon such termination, the
22  Owners became entitled "to retain the full amount of the Option Consideration they
23  previously received without any deduction or offset" and "neither Buyer nor the
24  Owners will have any further liability or obligation to one another hereunder
25  (including, without limitation, any direct, indirect, consequential or other damages)."
26  (Ex. C to Barnes Dec. at p. 3.) Barnes thus has no claim to recover any portion of the
27  option consideration. The attachment application therefore must be denied.

28

**2.      A Defaulting Purchaser May Not Recover Option Payments as a Consequence of His Default**

Even if Barnes had exercised his option to purchase the property—which he clearly did not as demonstrated immediately above—he would not be entitled to recover the option consideration already paid.

Barnes's unsupported theory is that a valid option exercise extinguishes the option, which is superseded by the purchase agreement that thereby springs into existence. Barnes' unwarranted conclusion is that once the Option Agreement purportedly was extinguished, he is entitled to a refund of all option payments made. Neither law nor logic supports such an absurd result.

Barnes overlooks the fact that even if he had validly exercised the option, he defaulted under the purchase agreements. Barnes failed to establish that he (a) delivered signed copies of the purchase agreements to escrow, or (b) deposited the $442,500 down payments with escrow within two business days of the purported exercise of the option, or in fact at any time whatsoever, or (c) was ready, willing and able to close the transaction within 30 days after the purported option exercise, as required by the purchase documents, or at any time at all. To the contrary, Barnes admits that he was unable to close the transaction because he could not obtain financing since the property was appraising at too low a value. (App., Ex. 85.)

Barnes' argument amounts to an assertion that an optionee may exercise an option, willingly default on the ensuing obligation to purchase the property, and then recover all of the option payments previously made, except for whatever liquidated damages are specified as a consequence of his default—limited to 3% of the purchase price. Not surprisingly, Barnes cites no authority that would countenance such an unjust result.

The cases Barnes does cite are not remotely relevant to the case at hand, as they did not involve any efforts to obtain the return of option consideration. Rather, the cases concern actions for *specific performance* of the obligation to sell real

-11-

1  property by the optionee when the optionor refused to perform. *Schomaker v.*
2  *Osborne*, 258 Cal.App.2d 887, 894-895 (1967) (lessees validly exercised option to
3  purchase property and were entitled to specific performance by lessors); *Erich v.*
4  *Granoff*, 109 Cal.App.3d 920 (1980) (same); *Cates v. McNeil*, 169 Cal. 697 (1915)
5  (same).

6          Here, Barnes was unable to complete the purchase, there was no failure of
7  performance by the Owners, and Barnes most assuredly is not seeking specific
8  performance—he just wants all of his money back. Barnes has produced no authority
9  whatsoever remotely suggesting such an unfair and inequitable result.

10          Having failed to demonstrate that either he had the ability to perform or the
11 Owners breached the purchase agreements—even making the unwarranted assumption
12 that such purchase agreements ever became effective—Barnes tortures the provisions
13 of such agreements to recharacterize the option payments as liquidated damages that
14 purportedly cannot exceed 3 percent of the purchase price under Civil Code Section
15 1677. There are at least three fatal flaws in Barnes' argument.

16          First, Barnes attempts to prove too much, and in fact has unwittingly conceded
17 that, if the Option Agreement in fact were a purchase contract, the Owners would be
18 entitled to damages for breach. By arguing that the liquidated damages provisions do
19 not apply because he did not initial them, Barnes has established that the Owners may
20 recover their ***actual*** damages. As demonstrated in Part III.A above, the Owners are
21 entitled to recover from Barnes the difference between the purchase price and the
22 property's value at the date of breach, which exceeds the total option payments.
23 Barnes' theory establishes the Owners' right to retain the option consideration.

24          Second, the option consideration was never intended to constitute liquidated
25 damages for Barnes' default. The liquidated damages provisions are part of the
26 purchase agreements, and specifically refer to retention of the deposit as the Owners'
27 remedy in the event of a default under the purchase agreements (assuming of course
28 the option was ever exercised). The deposit was carefully defined to refer to only

-12-

1    those amounts—$442,500.00—of additional funds Barnes was required to deposit into
2    escrow upon exercise of the option and execution of the purchase agreements. The
3    purchase agreements credited Barnes with the amount of the option consideration
4    against the purchase price if and only if he performed his obligations thereunder.
5    Having failed to do so, he certainly is not entitled to recover the option payments
6    anyway. Were the rule otherwise, all optionees who ultimately decided not to exercise
7    their option would nonetheless exercise it so that they could then default on their
8    obligation to purchase a property and recover the option consideration.

9         Further, it has been conclusively determined that option payments do not
10   constitute liquidated damages. *Allen v. Smith*, 94 Cal.App.4th 1270, 1279 (2002) ("A
11   consideration paid for a freely negotiated option does not constitute liquidated
12   damages or a penalty because the payment obligation does not arise on a breach of
13   contract by the optionee, but as an alternative to performance").

14        Third, as discussed in Part IV.D below, Barnes claims the transaction between
15   the parties was a "real property sales contract" within the meaning of Civil Code
16   Section 2985. Section 1681, however, expressly provides that the liquidated damages
17   provisions on which Barnes relies (Sections 1675-1681) ***do not apply to such real***
18   ***property sales contracts***. He should be estopped from invoking such provisions.

19        Simply put, the rule Barnes espouses is nonsensical. Even if he had validly
20   exercised the option, thereby "extinguishing" the Option Agreement and giving effect
21   to the purchase agreements, that does not mean the Option Agreement would be
22   thereby rescinded. The cases Barnes cites only state the general proposition that the
23   parties' prospective rights are governed by the purchase agreement after option
24   exercise; that does not mean that the option agreement is unwound, and Barnes offers
25   no authority whatsoever even hinting at such an unjust and inequitable result. Barnes
26   had no right to a return of the option consideration for any reason whatsoever; at most,
27   *if* he had fully performed his obligations under the purchase agreements, he was
28   entitled to a credit against the purchase price. Having failed to complete the purchase,

-13-

1  he cannot recover the option consideration. For this additional reason, the attachment
2  application should be denied.

3  **C.**     **The Option Agreement Was Exactly that—an Option to Purchase,**
4           **Not A "Disguised" Purchase Agreement**

5       Barnes next argues that the Option Agreement is not a "true" option but rather
6  a purchase agreement. Again, as discussed in Part III.A, if the Option Agreement were
7  in fact a purchase agreement, which it is not, then Barnes has breached it, entitling the
8  Owners to retain the option payments as partial compensation for the damages they
9  suffered in the form of the substantial decline in the property's value.

10      But the Option Agreement is in fact a true option, as established by recent
11  California Supreme Court authority addressing the issue that Barnes fails to cite. In
12  *Steiner v. Thexton*, 48 Cal.4th 411 (2010), the Court set forth the law governing the
13  determination of whether an agreement constitutes an option as follows:

14              As this court explained long ago, "When by the terms of an
15          agreement the owner of property binds himself to sell on specified
16          terms, and leaves it discretionary with the other party to the contract
17          whether he will or will not buy, it constitutes simply an optional
18          contract." (*Johnson v. Clark* (1917) 174 Cal. 582, 586, 163 P. 1004.)
19          Thus, an option to purchase property is "a unilateral agreement. The
20          optionor offers to sell the subject property at a specified price or
21          upon specified terms and agrees, in view of the payment received,
22          that he will hold the offer open for the fixed time. Upon the lapse of
23          that time the matter is completely ended and the offer is withdrawn.
24          If the offer be accepted upon the terms and in the time specified,
25          then a bilateral contract arises which may become the subject of a
26          suit to compel specific performance, if performance by either party
27          thereafter be refused." (*Auslen v. Johnson* (1953) 118 Cal.App.2d
28          319, 321–322, 257 P.2d 664.)

-14-

1    *Steiner*, 48 Cal.4th at 418.

2           The Court concluded that although the agreement before it was fashioned as a
3    purchase contract, the substance of the transaction was in fact an option. The
4    agreement obligated the defendant to hold open an offer to sell the parcel at a fixed
5    price for three years. The plaintiff had the power to accept the offer by satisfying or
6    waiving the contingencies and paying the balance of the purchase price but was not
7    ***obligated*** to do anything, and retained the right to terminate the agreement even if all
8    contingencies had been satisfied. The court accordingly concluded that since the
9    agreement expressly provided that the plaintiff could elect not to continue the
10   transaction at his sole and exclusive election, and he could terminate at any time for
11   any reason, the agreement was in fact an option. 48 Cal.4th at 420.

12          All of these elements are present here. Not only was the carefully-crafted and
13   negotiated form of the transaction structured as a lease with option to purchase, that
14   was also the substance of the contract. As in *Steiner*, the option here was unilateral:
15   the Owners irrevocably committed to sell the property at a specified price and on
16   stated terms and conditions for a fixed period of time in return for the option
17   payments.[4] It was completely up to Barnes whether and for how long to make the
18   option payments and whether to exercise the option; he had no obligations thereunder.
19   As in *Steiner*, if Barnes let the option lapse, the offer was withdrawn. *Steiner* therefore
20   demonstrates that the lease-option here was a true option, not a purchase contract.

21

22   ──────────────
23   [4] Barnes claims that the option was not truly irrevocable because his default under the
     lease would have terminated it. The contention is spurious. The Owners had no ability
24   to ***revoke*** the option; in other words, they had no right to unilaterally withdraw their
     offer to sell the property under the terms and conditions set forth in the purchase
25   agreements. An option is simply an offer which becomes irrevocable where, as here,
     separate consideration for such option exists. *Riverside Fence Co. v. Novak*, 273
26   Cal.App.2d 656, 660 (1969) ("An option supported by consideration is an irrevocable
27   offer"). Termination of the option as a consequence of Barnes' hypothetical default
     under the lease, even had it occurred, would not have been a ***revocation*** of the option,
28   because the Owners were not free to unilaterally withdraw their offer to sell.

1    The cases upon which Barnes relies, all of which substantially predate *Steiner*,
2    are readily distinguishable because they involve genuine issues as to whether the
3    parties intended a particular transaction, or a provision thereof, to involve simply an
4    option to purchase, or rather a binding agreement to purchase. For example, in *Smith*
5    *v. Morton*, 29 Cal.App.3d 616 (1972), the court concluded that the parties intended a
6    purchase contract, rather than an option, because the agreement required monthly
7    payments on the purchase price, with interest, and payment of the balance when the
8    option was exercised. The court concluded that the agreement was a purchase contract
9    with monthly instalment payments with the balance payable within five years.

10   Here, in stark contrast, Barnes was not required to, and did not, make any
11   payments on the purchase price. He made annual payments under the Option
12   Agreement to keep alive his option to purchase the property at the stated price. The
13   Option Agreement did not require him to purchase the property or pay the purchase
14   price. *Smith* is inapposite.

15   Barnes further asserts that obligations were imposed by the Option Agreement
16   that showed the parties intended a bilateral contract, citing *Holiday Inns of America,*
17   *Inc. v. Knight*, 70 Cal.2d 327 (1969). Barnes had no obligations to perform under the
18   Option Agreement. The choice was entirely his: he could continue making option
19   payments, and extend his ability to purchase the property at the stated price, or he
20   could cease making further payments. The choice was his and his alone.

21   Unable to cite any obligations that he was required to perform under the
22   Option Agreement, Barnes asserts the bootstrap argument that a default under the
23   lease would terminate the option. It would be difficult to imagine any lease/option that
24   would permit an optionee to maintain his right to purchase a property after defaulting
25   under the underlying lease. Regardless, Barnes cites no case holding that a provision
26   terminating an option upon a lease default suddenly transmutes an option into a
27   purchase agreement. *Holiday Inns* certainly does not support such a result, as the court
28   there did not recharacterize the option as a bilateral contract as Barnes asks the Court

1  to do here, but instead *enforced an option agreement*. Nor do the other cases Barnes

2  cites support his argument. *See Rodriguez v. Barnett*, 52 Cal.2d 154 (1959) (parties

3  entered into bilateral sales contract which gave buyers the right to withdraw if

4  dissatisfied with subdivision map proposed by governmental authorities; court refused

5  to construe deposit as separate consideration for giving the buyers the right to

6  withdraw); *Allen v. Smith*, *supra* (court construed standard form Residential Purchase

7  Agreement, which contained obligations to be performed by both parties, as bilateral

8  sales contract, despite language increasing the deposit amount as "non refundable

9  purchase option monies"). By contrast, the Option Agreement placed no obligations

10  on Barnes, but simply gave him the unilateral right to purchase the property.

11           Barnes also asserts that since the option payments were to be credited to the

12  purchase price, they are considered deposits, citing the inapposite decision in *Millgee*

13  *Investment Co. v. Friedrich*, 254 Cal.App.2d 802 (1967). In that case, the parties

14  entered into a purchase agreement, not an option, for certain property and then a lease

15  of adjacent property pursuant to which plaintiff made an initial payment of $10,000.

16  The agreements provided that the plaintiff had the absolute right to cancel the

17  agreement by a specified date. The plaintiff timely exercised that right, but the

18  defendants refused to return the money, claiming that the payment was consideration

19  for an option to purchase. There was no language in the agreements even suggesting

20  that the payment was for an option. The court concluded that since the plaintiff had

21  the right to terminate the agreements, the defendants had no basis to retain the funds.

22  Since *Millgee* did not involve an option, nothing therein supports the proposition that

23  option payments should be considered deposits on the purchase price.

24           The final case Barnes cites does not even implicate the issue of whether an

25  agreement is a true option or bilateral sales contract. In *Cook v. King Manor and*

26  *Convalescent Hospital*, 40 Cal.App.3d 782 (1974), the issue was the enforceability of

27  a liquidated damages provision in an agreement for the purchase of real estate. Since

28  there was no evidence that it would have been difficult to determine actual damages,

1   the court concluded the liquidated damages provision was unenforceable, but that the

2   seller could recover actual damages. The case offers no support for Barnes' position.

3           Simply put, both the form and the substance of the parties' transaction here

4   was a lease with the option to purchase—a true option transaction. Under the express

5   provisions of the Option Agreement, Barnes is not entitled to recover the payments he

6   made to tie up the property for four years while he decided whether he wanted, or was

7   financially able, to purchase it—four years during which the Owners saw the market

8   value steadily and substantially decline while they were locked into their agreement

9   with Barnes. The Option Agreement cannot be transmuted into something it is not

10  simply because Barnes, with the substantial benefit of hindsight, regrets the decisions

11  he made and wishes the Owners to pay the price. His "faux option" theory provides no

12  basis to recover the option payments and no basis to obtain an attachment.

13          **D.    The Option Agreement Is Not a Real Property Sales Contract**

14          In yet another flawed attempt to recover the option payments, notwithstanding

15  their non-refundable nature, Barnes disingenuously attempts to recharacterize the

16  Option Agreement as a real property sales contract, which Civil Code Section 2985(a)

17  defines as  "an agreement in which one party agrees to convey title to real property to

18  another party upon the satisfaction of specified conditions set forth in the contract and

19  that does not require conveyance of title within one year from the date of formation of

20  the contract."

21          Barnes asserts that since the Option Agreement does not require conveyance

22  of title within a year, it therefore must qualify as a real property sales contract. Under

23  Barnes' theory, every ***option*** to purchase real estate that is exercisable after one year

24  apparently automatically becomes a real property sales contract and not an option. The

25  contention does not make any sense, and Barnes cites no case so holding. To the

26  contrary, *see Palo Alto Town & Country Village, Inc. v. Bbtc Co.*, 11 Cal.3d 494, 503

27  (1974) ("an option to purchase real property 'is by no means a sale of property, but is

28  the sale of a right to purchase'" [citation omitted]).

-18-

1    The Option Agreement does not satisfy Section 2985's definition because it
2  does not contain any agreement by the Owners to convey title to Barnes. Rather, the
3  Option Agreement is just that: an agreement granting Barnes the **option** to purchase
4  the property **under the terms and conditions set forth in the purchase agreements**.
5  (Option Agreement, p. 1 [ECF 44-3, page ID #:2034].) If and only if the option were
6  exercised in accordance with the Option Agreement did the terms of the purchase
7  agreements become operative, and it is those purchase agreements that contain the
8  provisions by which the Owners agreed to convey title, **not** the Option Agreement.

9    In addition, Barnes fails to explain the effect of a determination that a
10  particular instrument meets Section 2985's definition, which effect is set forth in
11  succeeding sections, and includes limitations on the fee owner's ability to transfer or
12  encumber real estate subject to such a contract and provisions relating to application
13  of payments made thereunder. *See* Sections 2985-2985.6. It does not transmute an
14  option agreement into an installment contract, which appears to be Barnes' position.

15    Barnes relies upon the inapposite case of *Petersen v. Hartell,* 40 Cal.3d 102
16  (1985) to support his argument. That case did not involve an option agreement, but
17  rather a traditional installment land sale contract where the fee owner agreed to sell
18  undeveloped land for a specified price, payable in monthly instalments; the vendees
19  had the right to pay the entire balance of the purchase price at any time. 40 Cal.3d at
20  107. The vendees missed several payments, and the vendor elected to terminate the
21  contract. The court held that **where the seller of land retains title only as security for**
22  **amounts payable under an installment sale contract**, a vendee who willfully defaults
23  in one or more payments after having paid a substantial part of the purchase price
24  nonetheless retains an absolute right to redeem the property by paying the entire
25  balance of the price. *Id.* at 106.

26    Barnes is not a vendee who made substantial payments on a land installment
27  sale contract; he therefore has no redemption or restitution claim. The Option
28  Agreement is not an installment sales contract, and the Owners did not retain title only

1  as security for payment. Rather, the Owners agreed to part with title if and only if
2  Barnes properly exercised the option **and** fulfilled his obligations under the purchase
3  agreements.

4      All of the cases Barnes cites to support his argument concern express
5  agreements to purchase real property through installment contracts or outright sales
6  contracts. *Honey v. Henry's Franchise Leasing Corp. of Am.*, 64 Cal.2d 801 (1966)
7  (installment contract); *Behrendt v. Abraham*, 64 Cal.2d 182, 184 (1966) (installment
8  contract); *Caplan v. Schroeder*, 56 Cal.2d 515, 517 (1961) (purchase contract with
9  escrow); *Freedman v. Rector, Wardens & Vestrymen of St. Mathias Par.*, 37 Cal.2d
10  16, 18 (1951) (purchase contract with escrow). None of the cases involves an option
11  or an attempt to recharacterize an option as a purchase contract.

12      But the real fallacy of Barnes' argument is his unsupportable assumption that
13  if the Option Agreement is construed as an installment contract, he would be entitled
14  to a refund of all his option payments. He completely ignores the fact that, under the
15  authority of the very cases upon which he relies, the Owners must be given the benefit
16  of their bargain. Thus, in *Honey, supra*, the California Supreme Court held that upon
17  the vendee's default, the vendor was entitled to retain all payments made under the
18  installment contract to the extent the property had declined in value at the time of the
19  breach. 64 Cal.2d at 803-804. York has testified the property not worth even $9
20  million when Barnes vacated. (York Dec., ¶ 72.) In fact, Barnes himself stated in
21  September 2011 that the property was appraising at only $9 million to $10 million.
22  (App., Ex. 85.) The Owners' loss therefore exceeded the total option payments.

23      Barnes, however, simply asks that he be given all of his money back. His own
24  cases establish that he is not entitled to a refund even if the Option Agreement were
25  impermissibly construed as an installment contract. At a minimum, the Owners must
26  be given the benefit of their bargain—the difference between the contract price and
27  the market value at the date of the breach. Barnes has the burden to prove the excess,
28  if any, of his payments over the amount necessary to give the Owners the benefit of

1  their bargain. *Honey*, 64 Cal.2d at 805. Since Barnes has failed to provide any

2  evidence of market value at the date of breach, he has not carried his burden to

3  establish that the amount to be secured by the attachment is in a fixed or readily

4  ascertainable amount. For this additional reason, the application must be denied.

**E.      Requiring Barnes to Honor His Commitments Does Not Result in a Forfeiture**

7         Barnes next asserts that the Owners' retention of the option payments

8  constitutes a forfeiture under Civil Code Section 3275, purportedly because they

9  constitute "damages" for failure to perform his obligations. The contention is devoid

10  of merit for two reasons.

11        First, the retained option consideration is not a forfeiture because it is not a

12  consequence of Barnes' failure to perform his contractual obligations. Section 3275

13  provides that whenever "by the terms of an obligation, a party thereto incurs a

14  forfeiture, or a loss in the nature of a forfeiture, by reason of his failure to comply with

15  its provisions, he may be relieved therefrom" under certain conditions. The Owners

16  are entitled to retain the option consideration not because Barnes failed to perform his

17  obligations under the Option Agreement, but because Barnes made a series of

18  payments in order to retain for himself the right to purchase the property at the agreed-

19  upon price. There is no allegation that Barnes failed to perform his obligations under

20  the Option Agreement (nor could there be, since he had none); he simply chose not to

21  exercise his option to purchase. No principle of equity—and certainly none found in

22  Section 3275—would allow Barnes to shift the consequence of his decision not to

23  exercise the option to the Owners.

24        Second, as the cases Barnes cites recognizes, a "provision by which money or

25  property would be forfeited without regard to the actual damage suffered would be an

26  unenforceable penalty." *Ebbert v. Mercantile Trust Co.*, 213 Cal. 496, 499 (1931).

27  Here, Barnes completely ignores the actual damage the Owners would suffer if he

28  were permitted to recover the option consideration. As set forth above, the property

dramatically decreased in value between September 2007, when the Option Agreement was signed and when the Owners could have sold outright to someone else at full value, and September 2011, when Barnes terminated the option and moved out of a property now worth at most $9 million. Under Barnes' unreasonable view, the Owners, not him, should be made to bear the decline in the property's value. The Owners' retention of the option consideration simply cannot be considered a forfeiture because such payments correlate with the decline in the property's value—and of course were voluntarily made to preserve Barnes' right to purchase the property. Unlike in *Ebbert*, the amount of the purported "forfeiture" here represents an approximation of the damages the Owners suffered through diminution of the market value. As stated, the Owners could have sold the property outright to another buyer in 2007, and that buyer would have had to bear the consequences of the unanticipated but severe decline in value; having tied the property up for four years, Barnes unfairly is now trying to make the Owners suffer the loss instead of him. That was not the deal the parties made.

Simply put, honoring the parties' agreement, as expressed in the operative documents, does not and cannot result in a forfeiture. Neither Section 3275 nor any other principle of equity requires the Owners to suffer the consequences of Barnes' business decisions.

### F.   Barnes Cannot Recover the Other Amounts He Seeks

Barnes also seeks an attachment for amounts paid for taxes, insurance, maintenance, and other property-related expenses. He has no contractual claim for the recovery of such amounts. To the contrary, he agreed to bear those expenses under the express provisions of the lease. *See* Lease (ECF 44-5) at ¶ 11 (taxes), ¶ 22 (all maintenance and repairs), Addendum to Lease at ¶ 10. The lease firmly placed the responsibility for payment of these expenses on Barnes, ***regardless of whether he exercised the option and purchased the property***.

1       Barnes claims that he can recover such sums on a claim for money had and

2   received because there has been a total failure of consideration under an express

3   contract, citing *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal.App.4th 221, 230

4   (2014). But *Rutherford* requires that the party seeking restitution receive ***nothing*** of

5   value; here, Barnes enjoyed living in the Malibu beachfront property for four years

6   under the lease. Further, Barnes failed to suggest, much less establish, that the Owners

7   breached the lease or any of the other agreements. The undisputed evidence

8   establishes that the reason Barnes was unable to conclude the purchase was the

9   combination of the decline in the property's market value, limiting the amount of the

10  loan Barnes could obtain, and his lack of sufficient funds to make up the deficit

11  between the purchase price and the loan amount. Accordingly, an attachment cannot

12  issue on the $368,021.75 of taxes and $295,775.51 of gardening, pool service, and

13  other expenses he purportedly incurred during his four years of living at the property.

14      Nor may Barnes obtain an attachment based upon the $50,000 security

15  deposit. When Barnes vacated the property, he left it in a poor state of repair,

16  necessitating an expenditure of approximately $30,000 in repair and cleaning costs.

17  Worse still, during his four-year occupancy, Barnes without authorization or the

18  Owners' consent substantially altered the topography of the lot adjacent to the

19  residence; the Owners estimate that it will cost $72,000 to restore the lot to its original

20  condition. (York Dec., ¶¶ 66-69; Exs. 76-77.)

21      As the result of the foregoing, the Owners have an offset claim against Barnes

22  well in excess of the $50,000 security deposit. Accordingly, it does not matter whether

23  or not Barnes received the accounting of repair and cleaning expenses contemplated

24  by Civil Code Section 1950.5(g). *Granberry v. Islay Investments*, 9 Cal.4th 738, 749-

25  50 (1995) (landlord who failed in good faith to take advantage of the summary

26  nonjudicial deduct-and-retain procedure for security deposits allowed under Section

27  1950.5 may recover damages or offset for unpaid rent, repairs and cleaning if such

28

1  damages are established and reasonable). Barnes therefore has failed to establish the
2  likelihood that he will prevail on his claim to recover his security deposit.

3  **V.     NO ATTACHMENT MAY ISSUE AGAINST YORK AND REPUBLIC**

4       In no event has Barnes established any basis for issuance of a writ of
5  attachment against York and Republic. Neither of these defendants are party to the
6  contracts upon which Barnes sues. In fact, Barnes expressly admits that they were not
7  owners or sellers of the property, were not signatories to the agreements, and that they
8  "have no contractual privity with me." Barnes Dec., ¶ 15.

9       Under CCP Section 483.010(a), attachments may issue only on claims
10  founded upon a contract. Since Barnes admits that he has no contractual relationship
11  with York and Republic, he cannot obtain a writ of attachment against them.

12  **VI.    NO ATTACHMENT MAY ISSUE AGAINST THE INDIVIDUAL**
13  **DEFENDANTS**

14       Similarly, in no event is Barnes entitled to a writ of attachment against the
15  three individual defendants—York and the Separzadehs. One fundamental precept of
16  the attachment law is that no attachment may issue on a claim against natural persons
17  unless the claim arises out of their conduct of a trade, business or profession. Thus,
18  Section 483.010 provides in relevant part:

19       (c) If the action is against a defendant who is a natural person, ***an***
20       ***attachment may be issued only on a claim which arises out of the***
21       ***conduct by the defendant of a trade, business, or profession.*** . . .

22       [Emphasis added.]

23       The courts have construed the conduct of a trade, business, or profession to
24  mean "for the purpose of livelihood or profit on a continuing basis." *Nakasone v.*
25  *Randall,* 129 Cal.App.3d 757, 764 (1982). In that case, the court held that a real estate
26  broker who had also invested in real estate was not in the business of selling real
27  estate for purposes of the attachment statute.

28

1          Barnes has failed to adduce any admissible evidence that the claim against the

2    individual defendants arose out of their conduct of a trade, business or profession

3    under *Nakasone v. Randall*. Instead, he relies upon rampant hearsay to support his

4    assertion that the claim arises out of their conduct of a real estate business that would

5    meet Section 483.010's requirements. He refers to his "extensive research" into

6    unspecified records, as well as unspecified representations, and then avers that he is

7    "informed and believes" that the individuals are engaged in the business of real estate

8    investment. (Barnes Dec., ¶¶ 201-203.) As established in the concurrently-filed

9    evidentiary objections, such statements lack foundation and are not based upon

10   personal knowledge, and therefore are inadmissible. Barnes' failure to meet his burden

11   to establish that his claim arises out of the conduct of a trade, business, or profession

12   requires denial of the application against the individuals.

13   **VII.   CONCLUSION**

14         The Owners could have sold the property outright for almost $15 million back

15   in 2007. Instead, they in good faith entered into the lease/option agreement with

16   Barnes, who received the full use and enjoyment of the property for four years while it

17   declined by as much as $6 million or more in value. Barnes now seeks to saddle the

18   Owners with the full consequences of that market decline, even though the risk of

19   decline was Barnes' alone—as was the then-expected reward of a substantial increase

20   in the property's value. Neither the parties' agreements, nor the law, nor any concept

21   of equity would countenance such a result.

22         For the foregoing reasons, Defendants respectfully request that the Court deny

23   the attachment applications in their entirety as to all Defendants.

24   Dated: February 16, 2016           TOM LALLAS

25                                    MARK D. HURWITZ

26                                    LEVY, SMALL & LALLAS
                                      A Partnership Including Professional Corporations

27                                    By:_____/s/ Tom Lallas_____

28                                         Tom Lallas
                                      Attorneys for Defendants